97 N.Y.2d 109 (2001)
761 N.E.2d 577
735 N.Y.S.2d 885
THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v.
CARLOS DIAZ, Also Known as FULTON GUEVARA, Appellant.
Court of Appeals of the State of New York.
Argued September 13, 2001.
Decided November 20, 2001.
*110 Lynn W. L. Fahey, New York City, for appellant.
*111 Richard A. Brown, District Attorney of Queens County, Kew Gardens (James A. Dolan and John M. Castellano of counsel), for respondent.
Chief Judge KAYE and Judges SMITH and CIPARICK concur with Judge ROSENBLATT; Judge WESLEY dissents and votes to affirm in a separate opinion in which Judges LEVINE and GRAFFEO concur.

*112 OPINION OF THE COURT
ROSENBLATT, J.
CPL 670.10 authorizes a trial court to allow into evidence the testimony of a witness given at a prior trial if the witness is outside the state and cannot with due diligence be brought before the court. In the appeal before us, we must determine whether the People met this due diligence standard.
After three mistrials (two of which resulted in hung juries), defendant was convicted of robbery in the second degree (see, Penal Law § 160.10 [2] [b]). The only prosecution witness who could identify defendant as the assailant was the victim, Oscar Leal. Immediately after the third trial, Leal left the United States to take up permanent residence in Mexico. Leal, a Mexican national, required the assistance of a Spanish-language interpreter at the first three trials. New York officials telephoned Leal to ask him to return to the United States for a fourth trial. They did not, however, address him in his native language or employ an interpreter. Because the People did not ensure that the witness understood those conversations, we hold, as a matter of law, that the People acted with less than due diligence, and therefore reverse and order a new trial.[1]

I.
At the first three trials, Leal testified, in substance, that defendant threatened to shoot him if he did not surrender his valuables. He complied, surrendering $20 and his wristwatch. On the way to a friend's house to telephone the police, Leal noticed a patrol car. He stopped the car and reported the robbery. After a brief investigation, the police officers arrested defendant and in his pocket found a $20 bill and Leal's watch. When arrested, defendant claimed that he did not rob anyone, but had merely found the watch.
*113 Following the third mistrial, the defense moved for a trial order of dismissal pursuant to CPL 210.40 (1). After a hearing pursuant to People v Clayton (41 AD2d 204 [1973]), Supreme Court declined to dismiss the indictment. Although Leal had by this time moved to Mexico, the People did not reveal that fact to the Justice deciding the Clayton motion.[2]
When the case was called for the fourth trial, the People informed the court that Leal would not return to the United States. They sought permission to introduce into evidence a transcript of Leal's prior testimony in lieu of his live appearance. In opposition, defendant argued that admitting a transcript would violate CPL 670.10 and his constitutional right to confront witnesses against him.
The court conducted a hearing on whether to allow the People to use transcripts in place of Leal's testimony. At the hearing, the Assistant District Attorney (ADA) testified that during a recess in the third trial, Leal said he intended to return to Mexico to work on his mother's farm. The ADA believed, however, that Leal was merely musing about the possibility of moving "sometime in the future." Hearing testimony further revealed that in preparation for the fourth trial, the ADA attempted to contact Leal at his last-known home and workplace, but could not find him. Leal's employer informed the ADA that he believed Leal had returned to Mexico. Ultimately, police detectives obtained Leal's Mexican address and phone number from Leal's cousin.
A detective testified that he telephoned Leal in Mexico and told him, in English, that he was needed in New York for a fourth trial, but Leal said he was too busy to return. The detective testified that in his opinion, Leal could understand English. A different ADA then testified that he telephoned Leal to follow up on the detective's conversation. Addressing Leal in English, the ADA offered to pay the travel expenses, but Leal still refused to return to New York. The hearing concluded with the ADA's testimony that Leal "certainly wasn't fluent in English," but "appeared to understand me at some point."
The court granted the People's motion, concluding "that the People have exercised due diligence" in attempting to bring Leal before the court. The jury convicted defendant of robbery in the second degree, and the Appellate Division affirmed. The *114 dissenting Appellate Division Justice granted defendant leave to appeal to this Court, and we now reverse.

II.
Insofar as it allows a jury to convict a defendant based on a witness's previous testimony, CPL 670.10 (1) is an exception to the Sixth Amendment right of confrontation (see, Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 670.10, at 382-383). Although the right of confrontation contemplates that testimony against an accused be "delivered live within eyesight and earshot of the jurors" (People v Arroyo, 54 NY2d 567, 577 [1982]), the statute makes, and the Constitution allows, limited departures based on necessity and fairness.
In a number of instances this Court has sustained the use of previous testimony pursuant to CPL 670.10. We did so, for example, in Arroyo (54 NY2d, at 573, supra), by upholding the introduction of a witness's prior testimony after she had disappeared inexplicably. In Arroyo, however, the People exercised due diligence in trying to locate her. After she had failed to appear, the prosecutor called her apartment twice; detectives visited the apartment several times, questioned neighbors, and searched for her "at the neighboring public hospital, at the Missing Persons Bureau, at the Bureau of Criminal Investigation and at the local [welfare] office" (id., at 573). These lines of inquiry brought investigators "to but one dead end after another" (id.). Accordingly, this Court concluded that the People exercised due diligence. Similarly, in People v Robinson (89 NY2d 648, 651 [1997]), we permitted the defense to introduce a witness's Grand Jury testimony when the witness could not be brought before the court, notwithstanding the defendant's due diligence.[3]
On the other hand, in other CPL 670.10 settings we have barred the use of transcript testimony when the statute's terms were not strictly met. For example, we refused to countenance the use of transcript testimony in People v Green (78 NY2d 1029, 1030 [1991]) and People v Harding (37 NY2d 130, 133 *115 [1975]), in which we cautioned that courts may not freely expand CPL 670.10's exceptions to confrontation.[4]
To prevent exceptions from devouring the rule, we have required "that the prosecutor's failure to produce [a witness] * * * not [be] due to indifference or a strategic preference for presenting her testimony in the more sheltered form of [a transcript] rather than in the confrontational setting of a personal appearance on the stand" (Arroyo, 54 NY2d, at 571, supra).
The case before us confirms the importance of this requirement. The proof rested principally on Leal's testimony. Considering that defendant was found with a $20 bill and Leal's watch, the case would seem open and shut. And yet, two juries heard the proof and observed the victim but were unable to conclude that defendant was the robber. It may, of course, be a coincidence, but the fact remains that the only jury to convict defendant had no opportunity to see, hear and appraise the victim. Indeed, in summation at the third trial, defense counsel specifically asked the jury to assess Leal's demeanor. The defense emphasized Leal's hesitancy in pointing to defendant as the robber, and argued that this reluctance pointed to defendant's innocence.
By allowing the People to base their case largely on a cold transcript, the court prevented the fourth jury from evaluating Leal's demeanor and, thus, his credibility. Before the Appellate Division, and again here, the defense contended that the ADA wanted Leal to remain absent. Regardless of what may or may not have been the People's subjective intent, we conclude that they undertook insufficient steps to constitute due diligence.
It was obvious that Leal was not confident in English. Due diligence requires that when the People try to secure a witness's presence at trial, they communicate in language the witness can understand. And there should be no question about the witness's understanding. The matter should not be left to surmise or impressions as to the witness's capacity to appreciate the conversation fully. In this case the People were so unsure of Leal's ability to speak and understand English that they provided him with an interpreter to prove their case before the jury. The People in effect ask us to conclude that Leal did *116 not understand English well enough to be an effective witness at trial, but did understand English well enough to grasp the subtleties of a conversation designed to induce him to travel thousands of miles from his home. Compliance with the requirements of due diligence in this case would have posed no extraordinary burden. Asking a Spanish-speaking detective to contact Leal could have been accomplished with minimal effort.
At the hearing's culmination, the ADA told the court that when he spoke to Leal on the telephone, Leal "appeared to understand me at some point." (Emphasis supplied.) Under the circumstances this is not enough. The due diligence requirement of CPL 670.10 is not satisfied by mere appearances or equivocation. Before proceeding without the witness, the court must be assured that the witness is beyond the practical reach of the prosecution.
Under CPL 670.10, a party seeking to induce a witness to return to the United States for trialhere, for a fourth trialmust make more than a pro forma request before the court declares the witness unavailable. Even under ordinary circumstances it is often difficult to convince victims to testify in criminal trials. Traveling from distant points, let alone from out of the country, presents even greater difficulties. Such witnesses would understandably be concerned about the length of time required, travel arrangements, expenses and potential personal disruption that might accompany a trip of this sort. Due diligence under these circumstances required the People to explain to the witness, fully and plainly, what they would do to accommodate these concerns. Here, as a matter of law, the People did not exercise due diligence within the meaning of CPL 670.10 (1).[5]
Contrary to our dissenting colleague's contention, we have not determined that Leal could speak and understand only Spanish. Indeed, as the dissent emphasizes, Leal had "some proficiency in English" (dissenting opn, at 118). In measuring the People's diligence in the case before us, however, it is the level of Leal's comprehension that counts. Even the most *117 rudimentary communicationsexplaining a timetable or giving travel directionscan be labored if not confusing for someone with a limited understanding of the language.
We do not doubt that Leal knew the prosecution wanted him back, but that does not satisfy the People's burden of establishing due diligence in convincing him to return. Considering that a trial on paper should be conducted only as a last resort, the underlying goal of CPL 670.10 is not for the prosecution to go through the motions come what may, but to succeed in bringing the witness to court. In the face of Leal's reluctance, the prosecution could have engaged a bilingual individual who could have evaluated Leal's misgivings and explained the lengths to which the State was willing to go to assuage them. This would have been easy. Just as the importance of having accurate testimony at trial prompted the People to use a translator, the comparable importance of having live testimony required that the People address Leal in his native tongue when trying to secure his presence at trial. In sum, using understandable language to get the witness to the trial is as important as using understandable language to question the witness at the trial.
The dissent recognizes the need for clarity in a witness's testimony and the potential for confusion when being cross-examined in another language. The same confusion and lack of comprehension, however, are equally likely when explaining the nature and extent of the State's promises regarding travel, costs and time away from home.
Accordingly, the order of the Appellate Division should be reversed and a new trial ordered.
WESLEY, J. (dissenting).
Because the record in this case supports the findings of Supreme Court and the Appellate Division that the People did exercise due diligence in attempting to procure the live testimony of Oscar Leal, we respectfully dissent.
We agree with the majority that "[d]ue diligence requires that when the People try to secure a witness's presence at trial, they communicate in language the witness can understand" (majority opn, at 115). However, we disagree with the majority's conclusion that the only acceptable proof of Leal's ability to understand English was the use of an interpreter during Leal's testimony at the first three trials. Based on this conclusion, the majority determines that, as a matter of law, the People did not exercise due diligence. Essential to such a *118 determination is that Leal can speak and understand only Spanisha finding not made by either Supreme Court or the Appellate Division.
To our minds, there is ample evidence to support a finding that Leal was able to speak and understand English at a level necessary to comprehend the telephone calls from the New York officials. Assistant District Attorney Guido and Detective McCormack both described conversations they had with Leal during the third trial that indicate some proficiency in English.[1] In addition, the People offered testimony describing the details of telephone conversations Leal had with Detective McCormack and Assistant District Attorney Rothstein that indicate *119 that Leal had an understanding of English.[2] Detective McCormack stated that "[h]is English is, you know, with an accent, but [it] is pretty decent" and that "[h]is English was pretty good" and "understandable." Assistant District Attorney Rothstein testified that "I guess I would agree with what Detective McCormack said. He described it as `understandable.'" Rothstein continued, "I could understand him for the limited purposes of this discussion."
Since there was testimony as to Leal's ability to understand English, there is ample evidence in the record to support the findings of Supreme Court and the Appellate Division. In People v Budd (46 NY2d 930, 931), we held that due diligence is *120 normally a mixed question of law and fact precluding this Court's review if there is any evidence in the record to support it. Thus, the determinations below are beyond our review powers.
Moreover, it is not "obvious" that Leal was deficient in English just because he was provided a Spanish interpreter at trial. Because of the need for clarity in a witness's testimony and the potential for confusion while being cross-examined in another language, trial counsel might well choose to allow his or her witness to testify in the language in which they are most proficient. The use of an interpreter at trial does not automatically imply that a witness is unable to speak or understand English. The majority would mandate the use of an interpreter when assessing the ability of a witness to understand post-trial communications such as those under review here.
Due diligence does require that the People communicate with a witness in language the witness can understand. It is the witness's level of comprehension of that language that counts. There is ample evidence to show Leal clearly understood the People's attempts to persuade him to return to New York. That conclusion, made by Supreme Court and the Appellate Division, is a mixed question of law and fact. We do not have the authority to overturn it no matter how convinced the majority may be that there was a better way to handle the situation.
Accordingly, we would affirm the order of the Appellate Division.
Order reversed, etc.
NOTES
[1] The determination whether the People exercised due diligence is normally a mixed question of law and fact precluding this Court's review if there is any evidence in the record to support it (see, People v Budd, 46 NY2d 930, 931 [1979]). This case presents a legal sufficiency issue: whether due diligence can be met when conversations with the witness occur in a language in which the witness is not fluent. Because this case examines the minimal requirements of due diligence, the issue is properly before us (cf., People v McRay, 51 NY2d 594, 601 [1980]).
[2] After defendant's conviction, he moved to have the Clayton motion reconsidered. Another Justice, who presided over the fourth trial, considered and denied the motion.
[3] See also, People v Fisher, 223 NY 459 (1918) (allowing, pursuant to former Code of Criminal Procedure § 8 [3] [now CPL 670.10 (1)], the admission of a stenographic transcript of a preliminary examination taken in accordance with former Code of Criminal Procedure § 221-b [now Judiciary Law § 319]); People v Geraci, 85 NY2d 359 (1995) (authorizing the use of Grand Jury testimony where the defendant intimidated the witness).
[4] See also, People v Ayala, 75 NY2d 422, 428-429 (1990) (holding that prior testimony could not be used when taken at a preliminary hearing in which defendant did not have a sufficient incentive to cross-examine the witness); People v Simmons, 36 NY2d 126, 131 (1975) (same).
[5] Defendant argues that the Confrontation Clause requires the People to avail themselves of provisions of the Mexico-United States Mutual Legal Assistance Cooperation Treaty (Dec. 9, 1987, 27 ILM 443). Further, defendant suggests that the treaty could be used to require unwilling witnesses to give live testimony via teleconferencing. These arguments are unpreserved for review, and we therefore do not address them.
[1] * * * He was downstairs. I had him sit in my cubical and I believe I went out and got him a soda and something to eat and I gave him a couple of magazines to read while he was sitting there that were on my desk, and I had a conversation with him.
"Basically, we started talking about SCUBA diving, that I had been SCUBA diving in Mexico, and we started talking about Mexico and he said that he wanted to go back to Mexico; that his familyhis mother had a farm there. That she owned a small bit of land and that his family made money by planting vegetables, and that he was here in the United States working as a waiter/cashier to make money so that he could buy or rent more land so that they could grow more vegetables in Mexico." (Guido testimony, Dec. 24, 1996 hearing transcript, defendant's appendix, at 10.)
"Q Do you know, as you sit here now from information you possessed, whether or not he was legally in this country? * * *
"A Only based on personal conversations. I don't know for a fact.
"THE COURT: Personal conversations with whom?
"THE WITNESS: Mr. Leal.
"THE COURT: What did he tell you?
"THE WITNESS: He told me he was hereI believe he didn't have any documentation. He was just here to work.
"BY MR. SILBERBLATT:
"Q For seven years; correct. * * *
"A That's correct." (Id., at 20.)
"Q Detective, how many times did you speak personally to Oscar Leal?
"A Back in August we had a lengthy conversation. That would be August 14th.
"Q Did it seem to you on August 14th, that Mr. Leal was reluctant to come to court?
"A Well, he was concerned, he was missing a lot of time from work. So he wasn't very happy coming to court because of that.
"Q Did he say anything to you which indicated his unhappiness in coming to court?
"A Just in reference to his employment.
"Q He told you he was missing time on his job?
"A Right. For the days he was coming to court, he wasn't getting paid and he was upset about that." (McCormack testimony, at 35-36.)
[2] "A I called and I got a male on the phone and I asked if this was Oscar Leal and he said, `Yes, it was.' I identified myself as being Detective McCormack from the D.A.'s Office.

"Q After you identified yourself, what is the next thing he said to you?
"A Well, he stated he wasn't coming back to court and I can keep his watch.
"THE COURT: He said what?
"He is not coming back
"THE WITNESS: He is not coming back to court, to get his watch. I could keep his watch" (id., at 31).
"Q And what, if anything, did he tell you after that? Or tell us about the conversation.
"A Then I asked, `Well, that wasn't my purpose. I wasn't here to bring back property to you. Apparently, the case is continuing and we need you to appear in court again.'
"At that time I said he had to appear in court and I asked if he was coming to the United States in the near future and he said, `No,' and at that point I said that we would provide (sic) any legal problems he would have or transportation, we would arrange that for him to come to the United States and at that point he said he had no desire to come back to America, he was just here temporarily to make money, because the family has a business in Mexico and he had no intention of returning" (id., at 32).
"A * * * I spoke to a person who identified himself as Mr. Leal and I indicated that I was now the Prosecutor on the case and would like him to return to New York to testify at the next trial.
"He indicated to me that he had returned to Mexico and was working onI forget. I might have said his mother's or his aunt's, someone's farm, and he didn't want to return nor could he return, because of his immigration situation.
"I offered to have my office pay for his airfare and hotel expenses in New York. I also offered to arrange with Immigration to allow him into the country for the limited purpose for testifying here, and he indicated that he had no intention or desire to return here, even if I took those steps.
"I also asked him when he had left New York for Mexico, and he indicatedI don't remember the exact date. He said either August 14th or 15th or August 15th or 16th, but it was clear to me that it was a day or two after his testimony in the third trial." (Rothstein testimony, at 50-51.)