[970 NE2d 380, 947 NYS2d 357]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KHEM-WATTIE BEDESSIE, Appellant.

Argued February 9, 2012; decided March 29, 2012

148

**POINTS OF COUNSEL**

*Law Office of Ronald L. Kuby,* New York City (*Ronald L. Kuby* and *Lea Spiess* of counsel), for appellant. I. The trial court erroneously admitted the medical records of Dr. Rosenfeld, containing the double hearsay statement allegedly made by the victim to his mother that someone "put his peepee in her wee-wee." Without that inadmissible statement, the evidence was legally insufficient to support defendant's conviction of rape. (*People v Ballerstein,* 52 AD3d 1192; *Rivera v City of New York,* 293 AD2d 383; *People v Lipsky,* 57 NY2d 560; *People v Reade,* 13 NY2d 42; *People v Lytton,* 257 NY 310; *People v Taleisnik,* 225 NY 489; *People v Deacons,* 109 NY 374; *People v Roach,* 215 NY 592; *People v Murray,* 40 NY2d 327; *People v Dunbar,* 205 Misc 630.) II. The trial court's exclusion of expert testimony on false confessions was an abuse of discretion. (*United States v Hall,* 93 F3d 1337; *People v Kogut,* 10 Misc 3d 305; *People v Taylor,* 75 NY2d 277; *Smith v United States,* 348 US 147; *Singletary v Fischer,* 365 F Supp 2d 328; *People v Wiggins,* 16 Misc 3d 1136[A], 2007 NY Slip Op 51715[U]; *People v Green,* 250 AD2d 143; *People v Philips,* 180 Misc 2d 934; *People v Days,* 31 AD3d 574, 7 NY3d 811; *People v LeGrand,* 8 NY3d 449.) III. Defendant was denied her right to effective assistance of counsel under the constitutions of the State of New York and the United States of America. (*People v Lombardi,* 139 AD2d 767, 72 NY2d 920; *People v Henry,* 95 NY2d 563; *People v Baldi,* 54 NY2d 137; *Strickland v Washington,* 466 US 668; *Gersten v Senkowski,* 299

F Supp 2d 84, 426 F3d 588, 547 US 1191; *Eze v Senkowski*, 321 F3d 110; *People v Clarke*, 66 AD3d 694; *People v De Jesus*, 42 NY2d 519.)

*Richard A. Brown, District Attorney*, Kew Gardens (*Laura T. Ross* and *John M. Castellano* of counsel), for respondent. I. The victim's statements contained in the medical records were properly admitted and any error was harmless. (*People v Liccione*, 50 NY2d 850; *People v Kello*, 96 NY2d 740; *People v Graves*, 85 NY2d 1024; *People v Kennedy*, 68 NY2d 569; *People v Ortega*, 15 NY3d 610; *Williams v Alexander*, 309 NY 283; *Johnson v Lutz*, 253 NY 124; *Matter of Leon RR*, 48 NY2d 117; *People v Taylor*, 80 NY2d 1; *Cover v Cohen*, 61 NY2d 261.) II. The trial court properly exercised discretion in denying defendant's request to introduce expert testimony regarding false confessions, and any error in the ruling was harmless. (*People v LeGrand*, 8 NY3d 449; *People v Hill*, 85 NY2d 256; *People v Taylor*, 75 NY2d 277; *People v Cronin*, 60 NY2d 430; *People v Keindl*, 68 NY2d 410; *People v Shepard*, 259 AD2d 775; *People v Young*, 7 NY3d 40; *People v Ciaccio*, 47 NY2d 431; *People v Williams*, 6 NY2d 18; *People v Wiggins*, 16 Misc 3d 1136[A], 2007 NY Slip Op 51715[U].) III. Defendant was afforded meaningful representation both before and during trial. (*People v Benevento*, 91 NY2d 708; *People v Baldi*, 54 NY2d 137; *People v Baker*, 14 NY3d 266; *People v Satterfield*, 66 NY2d 796; *People v Borrell*, 12 NY3d 365; *People v Turner*, 5 NY3d 476; *People v Henry*, 95 NY2d 563; *People v Flores*, 84 NY2d 184; *Strickland v Washington*, 466 US 668; *People v Ryan*, 90 NY2d 822.)

### OPINION OF THE COURT

READ, J.

In this appeal, we are asked for the first time to consider the admissibility of expert testimony proffered on the issue of the reliability of a confession. While in a proper case expert testimony on the phenomenon of false confessions should be admitted, the expert here did not propose testimony relevant to this defendant or her interrogation. As a result, the trial judge did not abuse his discretion when he declined to hold a *Frye* hearing to assess whether any principles about which the expert proposed to testify were generally accepted in the scientific community, or to permit the expert to testify.

### I.

Defendant Khemwattie Bedessie, who worked as a teacher's assistant at Veda's Learning World in Queens, New York, is alleged to have sexually abused a four-year-old boy left in her

care. In particular, she is accused of pressing the boy's hand to her partially exposed breast, and touching his penis on three separate occasions between January 2 and February 11, 2006. During the last of these sexual encounters, defendant is also alleged to have placed the boy's penis against and into her vagina. Suspicion that defendant had sexually abused the boy first surfaced on February 19, 2006, a Sunday. The boy, who was recovering from a virus, had developed a rash in his rectal area. After his mother finished bathing him that evening, he repeatedly complained of itching, causing his mother to ask him if anyone had touched him in his "private areas." The mother had asked her son this question before, and he had always replied "[n]o mommy." But this time, the boy answered "yes," that "Miss Anita," his name for defendant (along with "teacher"), "went up and down, up and down on his pee-pee." He asked his mother not to tell anyone, though, because "teacher" wanted him to keep this secret.

The mother sought medical attention for her son the next day. When she arrived at the hospital emergency room (the medical practice where she usually took him was closed for the President's Day holiday), she pulled the nurse aside and related what her son had revealed to her the night before. When examining the boy, the nurse asked him what happened at school. He said that Miss Anita had touched her "pishy" to his "pishy." The mother explained that "pishy" was her four year old's word for penis. The nurse asked the boy how Miss Anita had touched him, and he moved his hand around his penis in a circular fashion. The nurse notified the attending physician, who also examined the boy, and contacted the hospital's social worker. Hospital personnel got ahold of the police, who escorted the mother and the boy to the Queens Child Advocacy Center, where the boy underwent another medical examination. There they also met with Detective Ivan Bourbon. A 20-year police force veteran, Detective Bourbon was at the time working in the Queens Child Abuse Squad, which deals with allegations of physical and sexual abuse, neglect and assaults against children under 11 years of age.

Detective Bourbon was assigned to investigate this matter; he started out by gathering background information on the day care facility's owner and employees, generally by conducting various computerized searches. He visited the facility for the first time at night on February 21 or 22 (he was working the

night shift that week), just to observe the building. Detective Bourbon returned at midday on February 27, 2006, accompanied by two other detectives. He knocked on the door, identified himself to the lady who answered and asked to be shown around. He saw a room where he estimated that 9 to 10 children were sleeping or resting on cots; he also noticed three bathrooms on the first floor—one for boys, one for girls and one for staff. While Detective Bourbon was chatting with the lady who was giving him a tour, defendant walked in and was introduced to him as "Anita."

Then on March 1, 2006, Detective Bourbon and the two other detectives visited the day care facility again, arriving at about 10:00 A.M. This time he asked defendant to accompany him to the Queens Child Advocacy Center for an interview. She agreed. Once there, Detective Bourbon took her to the interview room, a small room with a desk, chairs and a two-way mirror. He immediately read defendant her *Miranda* rights, and she signed a *Miranda* form. Detective Bourbon then told defendant that the boy had made an allegation and "that it was very important[,] that we are here to find out the truth and find out what happened there. I know what happened, now I need to hear from your side." As he later testified at trial, Detective Bourbon did not, in fact, then have any idea what might have transpired between the boy and defendant beyond the boy's bare-bones allegation. He also later testified that he did not raise his voice, promise defendant leniency or discuss punishment at all.

According to Detective Bourbon, defendant "looked at [him] in the eyes and she looked very nervous and . . . got to slowly explain how this boy . . . was very different" from the other children at the day care facility—that he "would come to [her and] use his hands to touch her breasts," which led to an incident that occurred around noon time in early January, and then another in late January, early in the morning. Both times, she and the boy were in the bathroom. Defendant stated that she held the boy's penis, "jerking him" while his pants were down, as she "play[ed] with herself[,] using her fingers." Defendant then described a third encounter on a Monday morning in February. This time she dropped her pants, sat on the toilet in the teacher's bathroom, and jerked the boy's penis with one hand while she brought him forward into her vagina and pushed him in and out of her until he "start[ed] doing it himself . . . almost as if he had done this before." The interview began at about 10:30 A.M. and lasted over an hour.

When defendant finished, Detective Bourbon asked her if she would sit down with him and someone from the District Attorney's Office to recount on video what she had just told him. She agreed, and he contacted the Queens District Attorney's Office at roughly 11:45 A.M. The detective commented that defendant, "in the early stages" of his interview with her, expressed some relief at "getting this off her chest" and "telling the truth," saying that she herself had difficulty understanding "what she had done to this child." Defendant then gave a videotaped statement in which she described the three episodes of sexual abuse in considerably greater detail. The videotaped statement began at 12:53 P.M. and ended at 1:20 P.M.

Defendant was arrested after she made her oral confession. She was subsequently indicted for first-degree rape (Penal Law § 130.35 [3] [engaging in sexual intercourse with a child under 11 years old]) (one count); first-degree sexual abuse (Penal Law § 130.65 [3] [subjecting a child under 11 years old to sexual contact]) (six counts); and endangering the welfare of a child (Penal Law § 260.10 [1] [knowingly acting in a manner likely to be injurious to the physical, moral or mental welfare of a child under 17 years old]) (one count). Defense counsel moved to suppress the oral and videotaped statements as involuntary. At the end of the *Huntley* hearing on January 19, 2007, at which Detective Bourbon testified, Supreme Court denied the motion.

On May 29, 2007, the day before the trial was scheduled to begin, defense counsel made an application to the judge for permission to introduce the testimony of Dr. Richard J. Ofshe, an expert in the field of false confessions, on "issues such as the social science research that indicates that false confessions do exist and research regarding the correlation between the use of certain police interrogation techniques and proven false confessions." Defense counsel informed the judge that if he granted the application, the defense would need an adjournment until after June 19, 2007, when Dr. Ofshe was scheduled to return from two months in Europe.

Reasoning by analogy to our decision in *People v LeGrand* (8 NY3d 449 [2007]), which dealt with expert testimony on eyewitness identification, defense counsel argued that the judge should at a minimum hold a *Frye* hearing on the admissibility of Dr. Ofshe's proffered testimony, and urged that defendant "need[ed] an expert on this vital issue" of false confessions in order to "mount a meaningful defense." His application included Dr. Ofshe's curriculum vitae and a report dated May 18, 2007. The

report indicated that Dr. Ofshe had interviewed defendant on March 11, 2007.

Before beginning jury selection, Supreme Court denied defense counsel's application. The judge stated that he had read the cases and memorandum submitted by counsel, and that it appeared that all or most of the decisions considered expert testimony on eyewitness identification. He commented that he was "not inclined to draw a parallel with respect to expert testimony of false confessions . . . [and] accuracy of identification testimony," stating as follows:

> "I don't see in any way, shape or form how an expert can assist . . . juror[s] in their ability to draw conclusions from the evidence in a case by case basis [as to] whether or not a confession was falsely given. In this court's opinion jurors are completely and utterly competent to draw from their own life experiences, from their every day experiences whether or not a statement is in fact voluntary and knowingly given."

The judge further noted that, unlike the situation in "the identification cases," there was corroboration here if the jury believed the child.

During jury selection, defense counsel asked prospective jurors if they accepted the notion that "there are instances where there could be a false confession," and could "embrace that principle in the right circumstance even though there [was] not necessarily evidence of physical torture or abuse." Only one individual out of two panels of 14 prospective jurors voiced difficulty with this idea, saying that he considered it "pretty unusual that you'd get a false confession without some kind of extraordinary . . . torture tactic or some kind of crazy tactic." The judge granted defense counsel's for-cause challenge to this prospective juror.

The People called as witnesses the boy, his mother, the nurse who examined the boy at the emergency room and the doctor who examined him at the Queens Child Advocacy Center. This physician, a pediatrician and the Center's director, testified, among other things, that a four-year-old male could achieve an erection. Detective Bourbon took the stand, testifying as described earlier, and the jury was shown defendant's videotaped statement.

During the detective's testimony, defense counsel again brought up the subject of an expert on false confessions.

Supreme Court reiterated that a *Frye* hearing was not necessary because even if such evidence was scientifically valid, it might not be relevant in a particular case. He added that such expert testimony was not

> "appropriate in this particular case and the Courts have held, in my opinion, in my research, that such testimony usurps comments to the jury.

> "You do it in a case where there is little or no corroboration. In this particular case, this Court deemed, based upon the representation of the district attorney as to what the [child] was going to testify to, that there was ample corroboration, if believed, to support . . . the confession."

Defendant presented two character witnesses. She also called the sister of the day care facility's owner. This witness, a certified preschool teacher who helped her sister out three or four days a week in early 2006, described the facility's physical layout and the procedures followed, including that employees were instructed never to enter the children's bathroom and close the door, or take children into the staff bathroom; that the children used the cots only during their nap time from 12:30 to 2:30; and that noise coming from the bathrooms could be heard in the classroom. Dr. David Mantell, a forensic psychologist, testified about the proper technique for interviewing young children when investigating sexual abuse allegations. He opined that the mother's practice of randomly and frequently asking her son whether anyone had touched him inappropriately had a "suggestive quality" to it and alerted the child to a particular area of parental concern; and that young children, who are especially susceptible to suggestion, have difficulty keeping track of whether they know something because it actually happened, or because someone important in their lives told them about it.

Defendant testified on her own behalf. She denied having sexual intercourse with the boy, denied that she placed his hand on her breast and denied that she touched his penis. Defendant said she accompanied Detective Bourbon to what he called his office at the behest of the day care facility's owner, leaving at about 9:00 A.M. Upon arrival at their destination, the detective took her to a small room, placed a tape recorder on the table in the room and asked defendant if she knew why she was there. When she responded that she did not, he accused her of raping the boy, whose name he had written on a piece of paper that he

showed to her. Defendant testified that she asserted "[Y]ou can't accuse me like that." She also said that the detective claimed that he had a recording of her voice on the tape recorder "sexing" with the boy. Defendant challenged the detective "to play it and let [her] hear because [she] never done nothin' to no kids."

Detective Bourbon did not play the tape, but instead next confronted defendant with two options: to tell the truth and go home, or to go to Rikers Island jail, where she would be beaten. Defendant testified that she then "started to get scared" because she had never before experienced a "police problem." At that point, she acquiesced, telling the detective she would "do anything" for him if he would let her go home to her sickly mother.

According to defendant, Detective Bourbon then began quizzing her about what she wore and how she sat when reading books to the children; he said "promise me that this is going to [be] between me and you; accept everything that I will tell you and you [are] going to go home because your brother is outside." She later learned her brother was not outside, but she had no way of knowing it at the time because she could not "see anybody because [she] was in the room." Defendant assured the detective that she would do anything he wanted as long as he sent her home. When he then wrote something on a piece of paper and directed her to sign it, she did so without reading what she was signing.

Defendant denied that anything she said during her videotaped confession was true, asserting that she "said all those things on tape" only because Detective Bourbon gave his word that he would let her go home to her mother if she did; and that she sincerely believed that if she admitted to the acts described in the videotape, the detective would let her leave because that was what he promised. Defendant claimed that she did not know the meaning of some of the words that Detective Bourbon coached her to say—including orgasm and climax—and that he told her to put her hands between her legs, to describe how a woman feels after sex and to describe the difference between how she felt having sex with an adult as opposed to a child. Defendant said that Detective Bourbon did not put her in handcuffs or restrain her before she made the statement. Nor did he threaten or hit her.

The jury convicted defendant on all counts. On July 31, 2007, Supreme Court sentenced her to determinate prison terms of 20

years plus five years of postrelease supervision on the first-degree rape conviction, to run concurrently with determinate prison terms of five years plus three years of post-release supervision on the sexual abuse convictions, and a definite term of one year on the child endangerment conviction. Defendant appealed.

In a decision dated November 16, 2010, the Appellate Division unanimously affirmed (78 AD3d 960 [2d Dept 2010]). The court rejected all of defendant's claims of error, concluding, in particular, that "in the context of this case, the Supreme Court providently exercised its discretion in precluding expert testimony on false confessions generally, and as to the defendant's particular susceptibility to make a false confession under police interrogation" (id. at 960). A Judge of this Court granted defendant leave to appeal (16 NY3d 828 [2011]), and we now affirm.

## II.

That the phenomenon of false confessions is genuine has moved from the realm of startling hypothesis into that of common knowledge, if not conventional wisdom. After all, here there were two panels of prospective jurors, and during voir dire only one individual out of 28 questioned the proposition that an innocent person might confess to a crime he did not commit, even in the absence of physical coercion. This does not put off limits in every case, however, expert evidence on those factors that the scientific community has determined may contribute to a false confession.

Our decision in People v Lee (96 NY2d 157 [2001]) is instructive. Although Lee addressed expert evidence on the reliability of eyewitness identification, we there laid out broad principles governing the admissibility of expert psychological testimony; namely, "the admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court," which should be guided by "whether the proffered expert testimony would aid a lay jury in reaching a verdict"; "courts should be wary not to exclude such testimony merely because, to some degree, it invades the jury's province"; "[d]espite the fact that jurors may be familiar from their own experience with factors relevant to the reliability" of the evidence at issue, "it cannot be said that psychological studies" bearing on reliability "are within the ken of the typical juror"; and since the expert testimony "may involve novel scientific theories and techniques, a trial court

may need to determine whether the proffered expert testimony is generally accepted by the relevant scientific community" (*id.* at 162 [internal quotation marks and citation omitted]).

The judge in this case declined to hold a *Frye* hearing. He reasoned that this was unnecessary because Dr. Ofshe's expert testimony was not relevant and likely to assist the jurors in any way. He noted in particular that the jurors, based on their own life experiences, were competent to assess the reliability of defendant's confession, and, indeed, the expert's testimony threatened to usurp the jury's function. Second, he concluded that the child's testimony was likely to (and, in fact, did) corroborate defendant's confession.

Of course, as we pointed out in *Lee*, an expert's testimony, by its very nature, always to "some degree . . . invades the jury's province" (*id.*), and so this circumstance alone is not an adequate basis for rejecting expert testimony. As for corroboration of defendant's confession, the child's testimony substantiated both commission of the offenses charged, as is necessary whenever a defendant confesses (*see* CPL 60.50), and defendant's identity as his abuser. Defendant argued that this evidence was tainted by the suggestive, even though unintentional and well-meaning, influence of the mother, reinforced by the nurse and others who questioned the boy, who was of an age where suggestibility is a recognized risk. And certainly this is not a case where there was corroboration by verifiable evidence supplied in a defendant's confession itself and previously unknown to the police. Defendant furnished most of the details of the crimes with which she was charged, but there was no way to validate her narration—recanted at trial—although it was consistent with the nature and timing of the boy's allegation of sexual abuse. Whether or not his allegation alone was sufficient reason for the judge to deny defendant's application, Dr. Ofshe's proffer had nothing to say that was relevant to the circumstances of this case. The judge therefore did not abuse his discretion when he determined that Dr. Ofshe's testimony would not assist the jury in evaluating the voluntariness and truthfulness of defendant's confession or reaching a verdict.

Dr. Ofshe's report was slightly over seven pages long. He represented at the outset that his proposed testimony would "involve three elements: presentation of information on the topic of police interrogation and tactics that can result in unreliable statements, information on the phenomenon of false confession and an analysis of Ms. Bedessie's interrogation." But the

body of his report was filled with discussion of extraneous matters, speculation and conclusions based on facts unsupported even by defendant's version of her interrogation. For example, Dr. Ofshe discussed at some length the "rash of day-care sexual abuse cases based on false accusations elicited from pre-school children," the suggestibility of very young children and the caution that must be exercised when "de-briefing" them. As noted earlier, defendant's theory of the case was that the mother unwittingly created an illusion of sexual abuse in her son's memory, which medical and law enforcement personnel bolstered by sloppy questioning. In other words, nothing improper happened to the boy, although he and his cadre of supporters may have sincerely thought otherwise. But this has nothing to do with any factors or circumstances correlated by psychologists with false confessions. In any event, defendant could—and did—fully explore her theory through cross-examination and the direct testimony of another expert, Dr. Mantell.

Dr. Ofshe also criticized at length Detective Bourbon's failure to videotape his interview with defendant and any discussions that took place between her oral and videotaped confessions, a period of slightly more than one hour in Detective Bourbon's telling; slightly more than two hours in defendant's. While electronic recording of interrogations should facilitate the discovery of false confessions and is becoming standard police practice, the neglect to record is not a factor or circumstance that might induce a false confession. Dr. Ofshe talked in his report about videotaping as a means to identify what is called "contamination"—inadvertent or deliberate police disclosure of nonpublic crime facts to the suspect during interrogation, which then seep into the suspect's confession and so make it seem more credible (see Warney v State of New York, 16 NY3d 428 [2011]). To this point, he asks "Were [the particular facts that came into the videotaped statement] volunteered by the suspect or deliberately or inadvertently revealed by the interrogator?" But contamination was never relevant in this case. All that Detective Bourbon knew at the time of the interview was that the boy had made an allegation that defendant sexually abused him by genital sexual contact.

Dr. Ofshe suggested that Detective Bourbon may have neglected to record the interrogation so that he could surreptitiously overbear defendant's will and then school her as to what to say in her videotaped confession; specifically, the detective's

> "failure to record . . . deprives anyone seeking to evaluate the truthfulness of [defendant's] confession

of the evidence that would allow for this determination based on fact rather th[a]n prejudice. It would have been possible to evaluate whether she introduced the wealth of apparently corroborative information contained in the recorded statement, whether those parts of the recorded statement she introduced (if she is the source of any of it) were likely to be nothing more than inventions, and how much, if any, of the factual description of the sexual assaults contained in the confession was first provided by [Detective Bourbon] and then merely parroted by [defendant]."

This is argument and speculation, not a topic on which expert evidence might aid the jury in determining the reliability of defendant's confession.

Research in the area of false confessions purports to show that certain types of defendants are more likely to be coerced into giving a false confession—e.g., individuals who are highly compliant or intellectually impaired or suffer from a diagnosable psychiatric disorder, or who are for some other reason psychologically or mentally fragile (see Chojnacki, Cicchini and White, *An Empirical Basis for the Admission of Expert Testimony on False Confessions*, 40 Ariz St LJ 1, 15-17 [2008] [discussing "dispositional factors" associated with false confessions]). Dr. Ofshe did not proffer testimony that defendant exhibited any of the personality traits that research studies have linked to false confessions. And in fact, defendant, although not well-educated, appeared at trial to be an adult of normal intelligence. She displayed no sign of any of the mental factors associated by psychiatrists or psychologists with individuals more likely to confess to crimes they did not commit.

Research also purports to identify certain conditions or characteristics of an interrogation which might induce someone to confess falsely to a crime (id. at 17-18 [discussing "situational factors" associated with false confessions]). Dr. Ofshe offered to "apply the published analysis of interrogation to the specifics" of defendant's "deeply troubling" account of what happened to her. But his descriptions of the allegations on which he purported to base his expert opinion were general or vague and not, in fact, linked to any published analysis. First, he stated that defendant "report[ed] being tricked into accompanying

Detective [Bourbon] into his car and then being transported to a police facility." But he never explained how she claimed to have been "tricked." Defendant did not claim deception when she later testified at trial. As noted earlier, there she said that she left the day care center with Detective Bourbon at her employer's direction.

Dr. Ofshe also stated that defendant told him that Detective Bourbon "very strongly" accused her of sexually abusing the child in an aggressive and threatening manner, demeaned her by using vulgar language and was "punishing" in other unspecified ways. Dr. Ofshe did not say what these generalizations about Detective Bourbon's alleged behavior have to do with false confessions, based on published analyses of interrogations. And in her trial testimony, defendant did not portray Detective Bourbon as acting aggressively toward her during the interview. She claimed only that when he used the word "rape," she immediately denied the accusation; and when he told her that he had a tape recording of her sexual encounter with the boy, she called his bluff by inviting him to play it for her, and he backed down.

As a final example, Dr. Ofshe commented that

> "[i]n an interrogation such as [defendant's] in which the investigator relies on evidence ploys (claims that overwhelming evidence links the suspect to the crime) to base his a[s]sertion that the suspect's position is hopeless and therefore the suspect will be arrested, tried and convicted, introducing the treatment alternative strategy is likely to be very influential."

He defines the "treatment alternative strategy" as offering a suspect a choice "between two alternatives . . . clearly linked to very different results." In this case, he stated that Detective Bourbon "promised" defendant that "confession would result in nothing more than . . . being required to undergo counseling which . . . would happen in the building where she was being interrogated," but that if she "continued to deny guilt she would be sent to Rikers Island where she would be brutalized by the other inmates because she was a child abuser."

In the first place, Dr. Ofshe does not say that defendant ever informed him that Detective Bourbon made claims that there was "overwhelming evidence [linking her] to the crime"; he did not identify any published studies to support the proposition

that the "treatment alternative strategy" is generally accepted within the relevant scientific community as a situational factor associated with false confessions. And again, at trial defendant did not testify that she was offered treatment. She claimed that Detective Bourbon assured her there would be no repercussions if she confessed.

False confessions that precipitate a wrongful conviction manifestly harm the defendant, the crime victim, society and the criminal justice system. And there is no doubt that experts in such disciplines as psychiatry and psychology or the social sciences may offer valuable testimony to educate a jury about those factors of personality and situation that the relevant scientific community considers to be associated with false confessions. While the expert may not testify as to whether a particular defendant's confession was or was not reliable, the expert's proffer must be relevant to the defendant and interrogation before the court. Dr. Ofshe's proffer does not meet this standard, and therefore the trial judge did not abuse his discretion when he excluded the proposed testimony, even assuming that the confession was not corroborated.

We have considered defendant's other arguments and find them to be without merit. Accordingly, the order of the Appellate Division should be affirmed.

JONES, J. (dissenting). Mere acceptance that false confessions exist does not aid a jury in assessing the reliability of a thinly corroborated, recanted confession. Where, as here, there is little to no corroborating evidence connecting defendant to the commission of the crimes charged, a jury will benefit from the testimony of an expert explaining factors relevant to the reliability of a confession. Because I conclude, consistent with *People v LeGrand* (8 NY3d 449 [2007]), that the court abused its discretion by excluding defendant's expert testimony, I respectfully dissent.

New York does not allow a defendant to "be convicted of any offense solely upon evidence of a confession" (CPL 60.50). Section 60.50 requires "additional proof that the offense charged has been committed." Similarly, a "defendant may not be convicted of an offense solely upon unsworn evidence" given by a young child (CPL 60.20 [3]). Here, the evidence that led to defendant's conviction consists of her confession and the unsworn

statements, both in court and out of court, of a young child.[1] In these circumstances, a *Frye* hearing to consider the admissibility of expert testimony on the reliability of the confession, at the very least, should have been conducted. Moreover, it would be error to exclude such testimony, assuming it satisfied the relevant prongs enunciated in *LeGrand* (a case where, upon reviewing the *Frye* hearing, this Court concluded that the expert established at the hearing that his conclusions were generally accepted, and thus the testimony was error to exclude). Undoubtedly, relevant testimony of an expert on the reliability of confessions according to scientifically accepted principles, as well as Criminal Procedure Law §§ 60.20 and 60.50, seeks to prevent a taint of the criminal justice system—wrongful convictions.

In *LeGrand*,

> "we h[e]ld that where the case turns on the accuracy of eyewitness identifications and there is little or no corroborating evidence connecting the defendant to the crime, it is an abuse of discretion for a trial court to exclude expert testimony on the reliability of eyewitness identifications if that testimony is (1) relevant to the witness's identification of defendant, (2) based on principles that are generally accepted within the relevant scientific community, (3) proffered by a qualified expert and (4) on a topic beyond the ken of the average juror" (*id.* at 452).

A similar rule should be extended to the phenomenon of false confessions. Where, aside from the confession, there is little or no evidence connecting the defendant to the charged crime, to exclude expert testimony on the reliability of the defendant's disavowed confession would be an abuse of a trial court's discretion "if that testimony is . . . ([1]) based on principles that are generally accepted within the relevant scientific community, ([2]) proffered by a qualified expert and ([3]) on a topic beyond the ken of the average juror" (*id.*).

---

1. Concerning the charges of sexual abuse and rape, the child testified that defendant "squeezed [his] penis." When asked what did defendant do to him after defendant took her pants off, the child responded, "She just squeezed my pee-pee." The child's mother testified that he told her that defendant "went up and down, up and down on his pee-pee." Lastly, the medical evaluation written by the Child Advocacy Center indicated that the child told his mother that defendant had sexually abused him and "reported that [defendant] put his 'peepee in her weewee.' "

The majority observes that the trial judge concluded that a *Frye* hearing was unnecessary because the "expert testimony was not relevant and likely to assist the jurors" (majority op at 157). More specifically, the court noted that (1) "the jurors, based on their own life experiences, were competent to assess the reliability of defendant's confession, and, indeed, the expert's testimony threatened to usurp the jury's function [and (2)] . . . that the child's testimony was likely to . . . corroborate defendant's confession" (*id.* at 157). Although the majority does not accept all of the judge's observations, it nonetheless concludes, that such determination was not an abuse of discretion. I maintain, however, without a *Frye* hearing on the issue of whether the proposed testimony contained information generally accepted by the scientific community, such conclusion is not possible.

The majority questions the sufficiency of the proffer, curiously concluding that it was not "relevant to the defendant and interrogation before the court" (majority op at 161). Here, the proffer was made by a highly qualified individual as demonstrated by his curriculum vitae, who had previously testified in numerous cases where defendants raised the reliability of a confession as an issue. The proffer involved research concerning incidents that lead to false confessions and the tactics in this case that may have compromised the reliability of the confession. Additionally, Dr. Ofshe specifically applied his research to defendant's interrogation and "formal" videotaped confession.[2]

---

**2.** Dr. Ofshe described "the *pre-admission* phase of the interrogation (that part of an interrogation in which a suspect is influenced to shift from denial to admission)" and "the *post-admission* phase (during which the confession statement is developed and memorialized)" and explained that a contemporaneous electronic recording would have allowed one to assess, in this case, "whether [defendant] complied with [the detective]'s demand for a confession due to psychological coercion or whether she voluntarily gave a confession presumably because she felt guilt about a crime she had committed." He also explained that such a recording is necessary in the instant case for the following reasons: (1) "Physical evidence or lack thereof"; (2) "The suggestibility of very young children" and (3) "The de-briefing of very young children" (by a parent, rather than a professional in the area of child sexual abuse cases). While Dr. Ofshe's report explained how to ensure the reliability of defendant's confessions, he further explained how specific tactics employed could have led to psychological coercion and, thus, the unreliability of the videotaped confession. Specifically, Dr. Ofshe stated:

> "The tactic that [defendant] describe[d] [detective] using is the psychologically coercive motivational strategy I most frequently find in use in improperly conducted sex[u]al abuse interroga-

*(n. cont'd)*

Such a proffer, which was indeed relevant to this specific case, is sufficient to warrant a *Frye* hearing on whether such information is generally accepted.

Moreover, in light of *Warney v State of New York* (16 NY3d 428 [2011] [claimant was incarcerated for a murder he did not commit based upon his false confession]), expert testimony in this area warrants close consideration. It may be that this issue is not only beyond the ken of an average juror but also beyond the ken of many jurists, as it was in the area of the accuracy of eyewitness identifications. Understandably, the concept that a person would voluntarily admit to a crime he or she did not commit is counterintuitive. As we have previously observed in *LeGrand*, a trial court is "obliged to exercise its discretion with regard to the relevance and scope of [the] expert testimony," despite the conclusion that an expert should have been admitted in that case (8 NY3d at 459). Thus, not only would have it been proper to conduct a *Frye* hearing, but also proper to admit such testimony and limit it to information that is accepted by the scientific community and is relevant to this particular case.

In sum, it is necessary to extend *LeGrand* to the area of false confessions. Given the unreliability of the corroborating evidence—unsworn testimony and hearsay—it was an abuse of the court's discretion to exclude expert testimony on the reliability of defendant's recanted confession if the proffered testimony is indeed supported by the scientific community. Certainly, it was an abuse of discretion to deny a *Frye* hearing given that the proffer appeared to sufficiently highlight the issues relevant to the reliability of a confession and the factors that may have undermined the reliability of defendant's confession in this case. Accordingly, I would reverse the Appellate Division order and order a new trial.

---

tions. I am familiar with this tactic because it has been repeatedly described to me by persons whose interrogations were not recorded and because I have observed it in use in fully recorded interrogations done by investigators who did not recognize how blatantly coercive it was and allowed themselves to be recorded. I've found this tactic in use in so many coercive sexual abuse interrogations that I've labeled it as 'the treatment alternative strategy.' "

Dr. Ofshe then detailed the coercive tactics in this case and how they affect the reliability of a confession.

Judges CIPARICK, GRAFFEO, SMITH and PIGOTT concur with Judge READ; Judge JONES dissents and votes to reverse in a separate opinion in which Chief Judge LIPPMAN concurs.

Order affirmed.