**130 Nev., Advance Opinion 97**
IN THE SUPREME COURT OF THE STATE OF NEVADA

THOMAS EDWIN BRANT,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 63787



FILED

DEC 24 2014

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to a jury verdict, of first-degree murder. Second Judicial District Court, Washoe County; Brent T. Adams, Judge.

*Affirmed with instructions as to restitution.*

Jeremy Bosler, Public Defender, and John Reese Petty, Chief Deputy Public Defender, Washoe County,
for Appellant.

Catherine Cortez Masto, Attorney General, Carson City; Richard A. Gammick, District Attorney, and Terrence P. McCarthy, Deputy District Attorney, Washoe County,
for Respondent.

---

BEFORE THE COURT EN BANC.

## OPINION

By the Court, PICKERING, J.:

A jury convicted Thomas Brant of the first-degree murder of Kimberly Seaton, whose body was found in a shallow grave in Brant's garage. Under questioning by the police, Brant confessed to strangling Seaton. Brant's theory of defense was that another man, Robert Belsey, killed her. The defense maintained that Brant came home one night to

find Seaton dead in the living room; that Brant buried Seaton without reporting her death because he did not want his sister, who owned the house, to find out Seaton had been staying there; and that Brant's confession to killing Seaton was false. In furtherance of these theories Brant designated an expert to testify on police interrogation techniques and also sought to introduce evidence of two incidents of domestic violence in which Belsey had been involved three years earlier. The district court excluded this evidence, and Brant appeals. We affirm.

I.

A.

More than a month elapsed between Seaton's disappearance and the filing of a missing person report. On receiving the missing person report, the police investigated, learned that Seaton's last-known address was Brant's house, and went there to ask Brant about her. Brant denied knowledge of Seaton's whereabouts. He told the police that Seaton had moved out at his request some weeks earlier, after he came home one night and Seaton, who was drunk and belligerent, verbally assaulted him. Brant gave the police permission to search his house and, once that was completed, the outbuildings on his property, including his detached garage.

Brant unlocked the garage and opened the door but did not follow the police inside. He and a detective (Detective Gallop) stayed outside hunting for Brant's cat, which had gotten out during the search. Beneath some pallets in the garage, the police found a body buried in a mixture of loose dirt and kitty litter. At that point, the police halted the search to obtain a search warrant. On being told by the officers that they had "found something" in the garage, Brant swooned and leaned against a tree for support. Teary-eyed, Brant said that he had "no idea" what they could have found.

Detective Gallop asked Brant to accompany him to the police station to be interviewed, and Brant agreed. The two rode together in Gallop's car. When they arrived, Brant asked to use the restroom. In the restroom, standing at the sink washing his hands, Brant said to Gallop, "I know what they found over there. She was dead when I got home Sunday night."

Gallop escorted Brant to an interview room and read Brant his *Miranda* rights, which Brant waived. A nearly six-hour interrogation followed, counting food, coffee, bathroom, and cigarette breaks. Everything that occurred in the interview room, including the breaks, was videotaped; the exchanges Detective Gallop had with Brant outside the interview room, including at Brant's house and in the police station restroom, were audiotaped. Under interrogation, Brant admitted that, acting alone and without telling anybody, he buried Seaton in his garage. Initially, Brant maintained that he found Seaton dead in his living room and panicked; he explained that he secretly buried Seaton so that his sister, who owned the house, would not find out Seaton had been living there. Toward the end of the interrogation, Brant abandoned this explanation and confessed to killing Seaton: Brant stated that he "snapped" after Seaton verbally assaulted him and that he struck Seaton repeatedly on the side of the head and face and strangled her, crushing her throat.

Brant's account of Seaton's death is consistent with the injuries the police found on Seaton's body and with the coroner's findings as to Seaton's injuries and cause of death.

## B.

When Brant was a teenager, he suffered a severe head injury that left him with permanent brain damage, primarily to his frontal lobe.

Although the district court excluded Brant's police interrogation expert—a ruling Brant has appealed and that we discuss below—it did allow Brant to present expert testimony from a neuroradiologist, Dr. Anthony Bruno, and a neuropsychologist, Dr. Ted Young. Dr. Bruno reviewed Brant's radiology and testified to Brant's frontal lobe damage. Dr. Young reviewed the radiological reports, tested Brant, interviewed him, and reviewed Brant's work and family history. While Brant's brain injuries did not affect his intelligence—Brant's IQ tested well above average—they compromised Brant's "executive ability to resist impulses," and made him less focused and more reactive, especially under emotional stress, than a normal adult. Dr. Young found Brant's functionality surprising given the extent of the brain damage visible on his radiographs.

## II.

### A.

Brant did not move to suppress his confession as involuntary. Rather, his contention was, and is, that the latter part of his confession—the part where he admits killing Seaton, in addition to finding her body and burying it in his garage—is false. To support his false-confession theory, Brant designated an expert on police interrogation techniques, Dr. Jorey Krawczyn. The district court excluded Dr. Krawczyn's testimony on the grounds that it would not assist the jury in understanding the evidence or deciding a fact in issue.

NRS 50.275 governs the admissibility of expert testimony. "To testify as an expert witness under NRS 50.275, the witness must satisfy . . . three requirements: (1) he or she must be qualified in an area of 'scientific, technical or other specialized knowledge' (the qualification requirement); (2) his or her specialized knowledge must 'assist the trier of fact to understand the evidence or to determine a fact in issue' (the

assistance requirement); and (3) his or her testimony must be limited 'to matters within the scope of [his or her specialized] knowledge' (the limited scope requirement)." *Hallmark v. Eldridge*, 124 Nev. 492, 498, 189 P.3d 646, 650 (2008) (quoting NRS 50.275). The district court has "wide discretion" to determine the admissibility of expert testimony on a "case-by-case basis." *Higgs v. State*, 126 Nev. 1, 18, 222 P.3d 648, 659 (2010). Our review is deferential, and the district court's exercise of discretion will not be disturbed unless abused. *Hallmark*, 124 Nev. at 498, 189 P.3d at 650.

To meet *Hallmark*'s assistance requirement, the proponent of the expert witness testimony must demonstrate that the testimony "is relevant and the product of reliable methodology." *Id.* at 500, 189 P.3d at 651. "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence," NRS 48.015, but, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, waste of time or needless presentation of cumulative evidence." NRS 48.035(2). As for reliability, a "district court [should] consider whether the proffered opinion is (1) within a recognized field of expertise; (2) testable and has been tested; (3) published and subjected to peer review; (4) generally accepted in the scientific community (not always determinative); and (5) based more on particularized facts rather than assumption, conjecture, or generalization." *Higgs*, 126 Nev. at 19, 222 P.3d at 660.

The district court held a pretrial hearing on the admissibility of proposed expert witness testimony. Dr. Krawczyn did not testify at the hearing or prepare a written report. The district court "assume[d]" that Dr. Krawczyn "is qualified in methods of police interrogation" based on

defense counsel's representation that Dr. Krawczyn is a clinical psychologist who "provides lectures on interview and interrogation techniques utilizing body language and neuro-linguistic dynamics" and was being offered as an expert on police interrogation techniques.[1] Counsel further represented that Dr. Krawczyn had reviewed the audio- and videotapes of Brant's "interviews and interrogations," including "at the house, the . . . formalized interrogation [at the police station] and also all the smoke breaks in between." "Based upon what he saw in the review," Dr. Krawczyn "determined detective Gallop is using some standardized questions that [date] back to a 1956 polygraph operator's course and eventually progressed in the Criminal Division"; Gallop may have "used the Reid techniques,"[2] but without asking Gallop, the defense "cannot with 100 percent certainty say that is the technique." There is "a question [of] is this a good technique to use with a brain injury" that "goes to susceptibility and reliability of the statement." Summing up, defense counsel stated that,

---

[1]The record does not contain Dr. Krawczyn's curriculum vitae, although it is discussed by counsel in the transcript of the pretrial hearing, and the admissibility of his testimony does not appear to have been briefed in writing in the district court. The transcript reflects that counsel lodged a copy of *United States v. Hall*, 974 F. Supp. 1198 (C.D. Ill. 1997), *aff'd*, 165 F.3d 1095 (7th Cir. 1999), with the clerk after the district court deemed Dr. Krawczyn's testimony inadmissible.

[2]The record does not explain the reference to the "Reid technique" but our research indicates that it refers to a manual of interrogation techniques, Fred E. Inbau & John E. Reid, *Criminal Interrogation and Confessions* (1962), that now is in its fifth edition, Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, *Criminal Interrogation and Confessions* (5th ed. 2013).

... there are identified factors or ... interrelated components that are part of the concept of interrogative susceptibility that just better form the social interaction between the interrogat[or and] the interviewee. This is what we need the expert to go through, the factors and explain how these factors came together.[3]

"[T]he phenomenon of false confessions is a growing area of psychological and social science," and we "do not foreclose the possibility that under appropriate circumstances expert testimony [in this arena] could be relevant to a defendant's case and helpful to a jury." *Commonwealth v. Hoose*, 5 N.E.3d 843, 863 (Mass. 2014); *People v. Bedessie*, 970 N.E.2d 380, 388-89 (N.Y. 2012); *see United States v. Adams*, 271 F.3d 1236, 1244 (10th Cir. 2001). For this court to find an abuse of discretion in the exclusion of such testimony, though, there needed to be a specific proffer, supported by scientific or other proof, citing particularized facts, establishing that the testimony is relevant and reliable. The proffer in this case does not provide us the information needed to undertake that analysis.

At first blush, Brant's frontal lobe injuries suggest that his case may fall in line with cases such as *United States v. Shay*, 57 F.3d 126, 133 (1st Cir. 1995), where the appellate court remanded for the trial court to consider expert psychiatric testimony intended to establish that the defendant suffered from an identifiable mental disorder causing him to make grandiose, self-inculpatory statements. *See also* David A. Perez, *The (In)admissibility of False Confession Expert Testimony*, 26 Touro L. Rev.

---

[3]Counsel disclaimed any intention of having Dr. Krawczyn "invade the province of the jury and make the final conclusion or opinion as to whether Mr. Brant's statement in its entirety or particular[s is] false."

23, 63-64 (2010) ("admitting psychiatric testimony is not the same as admitting false confession expert testimony: the former informs the jury about a technical topic (i.e., a mental illness), while the latter draws conclusions for the jury regarding the credibility of a particular statement"). But the record before us does not establish a link between frontal lobe injuries like Brant's and a tendency to falsely incriminate oneself. On the contrary, at the hearing on the admissibility of experts, Brant's neuropsychologist, Dr. Young, testified that, to his knowledge, no research or studies have established such a correlation:

> Prosecution: So, Doctor, with regard to the . . . question about whether somebody with this particular injury would be more likely to lie?
>
> Dr. Young: Yes.
>
> Prosecution: Would they be more likely to lie to incriminate themselves or bring negative consequences upon themselves?
>
> Dr. Young: Well, yeah. I think that is a question I can't answer. I don't know of any research that addressed that kind of question. I really don't know how to respond.

Dr. Krawczyn's proposed testimony offered no contest to Dr. Young on this point. See also Adams, 271 F.3d at 1246 (distinguishing Shay as a case involving "a mental disorder characterized by an extreme form of pathological lying" on which expert testimony would be of assistance, as opposed to a case not involving such pathology).

This leaves the fact that, in interrogating Brant, Detective Gallop may have used the Reid technique (or a 1956 polygraph operator's technique) and the suggestion that a susceptible witness may make unreliable statements to establish the relevance and reliability of Dr. Krawcyzn's testimony. But with no evidence to establish a scientific or other recognized basis for challenging the interrogation techniques

Supreme Court
OF
Nevada

(O) 1947A

8

utilized in this case—which Dr. Krawczyn should have been able to identify if they were problematic, since he had complete audio- and videotapes of Brant's interview and interrogation—we have only Dr. Krawczyn's *ipse dixit* that the techniques possibly used may have influenced Brant's confession. This is not enough to establish an abuse of discretion in excluding such testimony. *See Bedessie*, 970 N.E.2d at 388 (upholding the exclusion of expert testimony on an assertedly false confession where the expert's "descriptions of the allegations on which he purported to base his expert opinion were general or vague and not, in fact, linked to any published analysis"); *United States v. Jacques*, 784 F. Supp. 2d 59, 66 (D. Mass. 2011) (excluding expert testimony that "the Reid technique enhanced the risk of an unreliable confession" where the expert proffering this opinion did not point to data or studies that established this); *see also People v. Linton*, 302 P.3d 927, 957-58 (Cal. 2013) (upholding the exclusion of expert testimony on false confessions where, as here, the jury had before it complete recordings of the defendant's interrogation and the proffered expert testimony was "highly speculative"); *Hoose*, 5 N.E.3d at 863-64 (to like effect).[4]

Brant complains that he needed Dr. Krawczyn to establish that the phenomenon of false confessions exists. But he accomplished that through Detective Gallop, who acknowledged under cross-examination that false confessions can and do occur. And, as discussed above, the

---

[4]*Linton*, 302 P.3d at 957, and *Hoose*, 5 N.E.3d at 863, both emphasize that the defendant did not recant his confession and that the evidence did not otherwise cast doubt on the veracity of the challenged confession, which is also true here. Indeed, Brant appears to have affirmed his confession that he killed Seaton in the interview of him that his neuropsychologist, Dr. Young, conducted. 1 J.A. 48-50.

proffer with respect to Dr. Krawczyn does not establish what else Dr. Krawczyn might have said that would be of assistance to the jury.

"We have consistently held that this Court will not speculate as to the nature and substance of excluded testimony." *Burgeon v. State*, 102 Nev. 43, 47, 714 P.2d 576, 579 (1986) (citing *Van Valkenberg v. State*, 95 Nev. 317, 594 P.2d 707 (1979)). Without a more detailed, properly substantiated proffer, we cannot say the district court abused its discretion in excluding Dr. Krawczyn's testimony.

## B.

Brant next challenges as judicial misconduct two unobjected-to statements by the district judge that he asserts improperly vouched for Detective Gallop's credibility and disparaged the defense. The first statement occurred during Gallop's cross-examination. After Gallop testified that he did not adhere to the Reid or any other particular interrogation technique, the district judge cautioned counsel that, "we don't need to spend a lot of time on a technique that he was not using in this interrogation." The second occurred at the end of Gallop's testimony, where the district judge stated, "Detective Gallop you have been very patient. You are excused." Since the defense did not object to the statements, plain error review obtains. *Oade v. State*, 114 Nev. 619, 622, 960 P.2d 336, 338 (1998).

This court has cautioned district judges against "making comments concerning the facts of any case at trial." *Shannon v. State*, 105 Nev. 782, 788, 783 P.2d 942, 946 (1989); *see Kinna v. State*, 84 Nev. 642, 647, 447 P.2d 32, 35 (1968) ("The court may not hamper or embarrass counsel in the conduct of the case by remarks or rulings which prevent counsel from presenting his case effectively or from obtaining full and fair consideration from the jury."). Detective Gallop's testimony took

considerable time, interrupted as it was by testimony from an otherwise unavailable witness and the screening of Brant's videotaped confession. It thus is not clear that the district judge's comment respecting Gallop's patience disparaged the defense. But assuming that it could be taken as disparagement, and assuming further that the judge improperly commented on Gallop's testimony about not using the Reid technique, the comments did not amount to plain error. The comments occurred over the course of a nine-day trial, in which the evidence of guilt was strong, and did not prejudice Brant in the presentation of his defense. *See McNair v. State*, 108 Nev. 53, 63, 825 P.2d 571, 578 (1992) (no reversible error when the "departures from strict judicial impartiality were brief episodes within the context of the entire trial"); *Randolph v. State*, 117 Nev. 970, 985, 36 P.3d 424, 434 (2001).

## C.

Last, Brant challenges the district court's refusal to allow him to introduce evidence of "other crimes, wrongs or acts" by the man whom Brant theorized was the real killer, Robert Belsey. NRS 48.045(2). Belsey had known Seaton for many years and gave inconsistent statements about his feelings toward her and about Brant, which the district court allowed Brant to explore through Belsey and the officer who interviewed Belsey, Detective English. Through Belsey's ex-girlfriend, Stavas, Brant also sought to introduce evidence of two prior incidents of domestic violence involving Belsey and Stavas three or four years earlier to impeach Belsey's credibility and to establish identity and modus operandi. In *Bigpond v. State*, 128 Nev. ___, ___, 270 P.3d 1244, 1245-46 (2012), we clarified that evidence of "other crimes, wrongs or acts" may be admitted for a nonpropensity purpose other than the nonpropensity purposes listed in NRS 48.045(2).

On appeal, Brant contends that Belsey's prior acts of domestic violence should have been admitted to contradict Belsey's testimony that he "had never been violent to a woman." But the cited statement was not properly before the jury, because the district court sustained the objection to defense counsel's question asking Belsey whether he had struck his former girlfriend. And, even if there was a statement to impeach, impeachment with extrinsic evidence on a collateral matter generally is not permitted. NRS 50.085(3); *McKee v. State*, 112 Nev. 642, 646, 917 P.2d 940, 943 (1996) ("It is error to allow the State to impeach a defendant's credibility with extrinsic evidence relating to a collateral matter.").[5]

## D.

One final point remains: The district court ordered restitution of $3,624.51 when the amount should have been $2,128.59. Brant filed his notice of appeal before his objection to the restitution amount was resolved. Since the parties have stipulated in this appeal that the district court should reduce the restitution ordered to $2,128.59, we direct the district court to correct the restitution amount in the judgment of conviction.

---

[5]We also find no abuse of discretion in the exclusion of the prior bad acts evidence offered, to the extent argued on appeal for other nonpropensity purposes, as the two incidents were remote in time, too dissimilar to establish identity or modus operandi, and cumulative insofar as they were offered as indirect impeachment of Belsey's credibility on the points on which direct impeachment was allowed. *See Ledbetter v. State*, 122 Nev. 252, 259, 129 P.3d 671, 676 (2006) ("A district court's decision to admit or exclude [prior bad act] evidence under NRS 48.045(2) rests within its sound discretion and will not be reversed on appeal absent manifest error.").

For these reasons, with the exception of the correction ordered with respect to the restitution appropriate, we affirm.

_____, J.
Pickering

We concur:

_____, C.J.
Gibbons

_____, J.
Hardesty

_____, J.
Parraguirre

_____, J.
Douglas

_____, J.
Cherry

_____, J.
Saitta