◼ The People of the State of New York, Respondent, v Selwyn B. Days, Appellant. [15 NYS3d 823]—

Appeal by the defendant from a judgment of the County Court, Westchester County (Warhit, J.), rendered December 20, 2011, convicting him of murder in the second degree (two counts), upon a jury verdict, and imposing sentence.

Ordered that the judgment is reversed, on the law and in the exercise of discretion, the defendant's motion for leave to introduce expert testimony on the issue of false confessions is granted, and a new trial ordered in accordance herewith, to be preceded by a hearing to determine the scope of the expert testimony on the issue of false confessions.

This case involves the murders in November 1996 of an elderly man and his home health aide in the man's home in Eastchester. By early 1999, the investigating law enforcement officials had exhausted all available leads, and the investigation was declared a "cold case." Approximately two years later, on February 15, 2001, the defendant was arrested for violating an order of protection that his former girlfriend had obtained against him in September 2000. Later that day, the defendant's former girlfriend informed the police that, during an altercation with her several months prior to that arrest, the defendant told her that he had killed two people. After an almost seven-hour interrogation, of which approximately the last 75 minutes were videotaped, the defendant confessed to the murders. When the defendant began his videotaped confession, he had been in custody for almost 14 hours, from approximately 11:00 a.m. on the day of his arrest until 1:41 a.m. the following day.

The defendant's first trial ended in a hung jury in 2003. After a second trial in 2004, the defendant was convicted of two counts of murder in the second degree, and this Court affirmed his conviction (see People v Days, 31 AD3d 574 [2006]). Beginning in April 2007, the defendant filed a series of motions pursuant to CPL 440.10 to vacate his conviction, based upon allegations of ineffective assistance of counsel, among other claims. After a hearing, the County Court determined that the defendant's counsel at his second trial was ineffective, vacated the judgment, and ordered a new trial (see People v Days, 26 Misc 3d 1205[A], 2009 NY Slip Op 52667[U] [Westchester County Ct 2009]). The defendant's third trial, conducted in February 2011, again ended with a hung jury.

Thereafter, the defendant was tried a fourth time, after

which the jury convicted him of two counts of murder in the second degree. The instant appeal is from the December 20, 2011, judgment rendered after the fourth trial.

Contrary to the defendant's contention, the County Court properly quashed the defendant's subpoena duces tecum seeking the names of 64 persons whose DNA profiles were indexed in the New York State Combined DNA Index System, or CODIS. The defendant sought the release of these names, contending that the DNA samples recovered from the murder weapon potentially matched the DNA profiles of those 64 persons. The defendant thus argued that any one of those persons may have had a connection to the crimes at issue. The defendant, however, failed to set forth a sufficient factual predicate in support of the subpoena to rebut the finding of the New York State Division of Criminal Justice Services that there was no scientific basis for selecting these 64 individuals for disclosure of either their names or complete DNA profiles (*see People v Kozlowski,* 11 NY3d 223, 241 [2008]; *People v Gissendanner,* 48 NY2d 543, 550 [1979]; *Matter of Constantine v Leto,* 157 AD2d 376, 378 [1990], *affd* 77 NY2d 975 [1991]; *see also* 9 NYCRR 6192.3).

Further, the County Court providently exercised its discretion in granting the People's request for a missing witness charge with respect to the defendant's mother. At the fourth trial, the defendant elicited testimony from three alibi witnesses. The People sustained their initial burden of showing that the defendant failed to call his mother as a witness, which he did at his first and second trials, and that she could have been expected to have material knowledge about his alibi, because he was reportedly living with her in North Carolina at the time the crime was committed. The burden then shifted to the defendant, who failed to "demonstrate that the [missing witness] charge would not be appropriate" (*People v Gonzalez,* 68 NY2d 424, 428 [1986]; *see People v Savinon,* 100 NY2d 192, 196 [2003]; *People v Macana,* 84 NY2d 173, 177-178 [1994]). Contrary to the defendant's contention, his mother's testimony would not have been cumulative of the alibi testimony presented by the other witnesses at trial (*see People v Dantzler,* 53 AD3d 504 [2008]; *People v Torres,* 255 AD2d 129 [1998]).

Additionally, contrary to the defendant's contention, there was a sufficient factual predicate to support a jury instruction regarding flight as evidence of consciousness of guilt (*see People v Umana,* 76 AD3d 1111 [2010]; *People v Robinson,* 10 AD3d 696 [2004]; *see also People v Jamison,* 173 AD2d 341, 342 [1991]).

Contrary to the defendant's contention, the County Court did not err in permitting the People to admit the prior trial testimony of the defendant's former girlfriend on the ground that she was "unavailable" to testify within the meaning of CPL 670.10 by virtue of her intentionally feigned loss of memory and a finding of contempt entered against her based on her repeated refusal to testify at the defendant's fourth trial. The Confrontation Clause of the Sixth Amendment to the United States Constitution prohibits the "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant ha[s] had a prior opportunity for cross-examination" (*Crawford v Washington*, 541 US 36, 53-54 [2004]; *see People v Pealer*, 20 NY3d 447, 453 [2013]). "[T]he basic objective of the Confrontation Clause . . . is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial" (*Michigan v Bryant*, 562 US 344, 358 [2011]; *see People v Pealer*, 20 NY3d at 453).

Criminal Procedure Law § 670.10 (1) codifies several exceptions to the right of confrontation, authorizing the use of prior trial testimony where a witness is unavailable due to death, illness, or incapacity, as well as in situations where the witness cannot with due diligence be found or brought before the court (*see People v Diaz*, 97 NY2d 109, 114 [2001]; *People v Arroyo*, 54 NY2d 567, 569-574 [1982]). In addition, a witness's assertion of the Fifth Amendment privilege against self-incrimination renders him or her unavailable within the meaning of CPL 670.10 (*see People v Whitley*, 14 AD3d 403, 404 [2005]; *People v Johns*, 297 AD2d 645, 646 [2002]; *People v Ortiz*, 209 AD2d 332, 333 [1994]; *People v Varsos*, 182 AD2d 508, 509 [1992]; *People v Chavers*, 82 Misc 2d 201, 204 [Sup Ct, NY County 1975]; *see also People v Brown*, 26 NY2d 88, 93 [1970]). The Appellate Division, Third Department, and the Appellate Division, Fourth Department, have further held that, even if a witness does not assert his or her Fifth Amendment privilege, the witness's persistent refusal to testify, coupled with a threat or finding of contempt, may render the witness unavailable within the meaning of CPL 670.10. For example, in *People v Knowles* (79 AD3d 16 [2010]), the Third Department held that the admission of a witness's testimony from a prior trial did not violate CPL 670.10 because the witness refused to testify and was consequently held in contempt for that refusal (*id.* at 24). The Third Department observed that the witness was extensively cross-examined at the prior trial, and that there were "protracted good faith efforts to induce her to testify in person" (*id.* at 24; *see also People v Spencer*, 219

AD2d 259, 264 [1996]; *People v Muccia*, 139 AD2d 838 [1988]). In *People v Barber* (2 AD3d 1290 [2003]), the trial court, after a hearing, held a witness in contempt because he persistently refused to testify despite the court's order to do so. Under those circumstances, the Fourth Department held that the witness "was unavailable to testify," and permitted the People to present prior trial testimony in evidence pursuant to CPL 670.10 (*People v Barber*, 2 AD3d at 1291).

Here, the defendant's former girlfriend appeared as the People's witness at the defendant's first trial, and provided incriminating evidence against him, including his remark that he had "gotten away with" killing an "old man" and a woman (*People v Days*, 26 Misc 3d 1205[A], 2009 NY Slip Op 52667[U], *14 [2009]). At the second trial, the former girlfriend's testimony from the first trial was admitted into evidence after the People made a proper showing that, notwithstanding their due diligence, she could not be brought before the court (*see People v Days*, 31 AD3d 574 [2006], citing *People v Diaz*, 97 NY2d at 117; *Matter of Mayyhew*, 33 Misc 3d 1222[A], 2011 NY Slip Op 52054[U] [Westchester County Ct 2011]). At the defendant's third trial, the defendant's former girlfriend refused to testify, and was compelled to do so pursuant to a material witness order (*see Matter of Mayyhew*, 33 Misc 3d 1222[A], 2011 NY Slip Op 52054[U] [2011]). At the third trial, she testified that she had been in a relationship with the defendant, and that a certain incident occurred in Mount Vernon. However, she testified that she could not remember that the defendant told her that he had killed two people, and asserted that her prior testimony did not refresh her recollection. Moreover, the defendant's former girlfriend testified that she could not remember having the defendant arrested in February 2001 for violating an order of protection issued in September 2000.

At the defendant's fourth trial, the defendant's former girlfriend was once again compelled to appear as a witness for the prosecution, again pursuant to a material witness order. She answered several basic questions. Among other things, the defendant's former girlfriend testified that, although she currently lived in South Carolina, she previously lived in Mount Vernon and, during that time, she came to know the defendant. However, she steadfastly maintained that she did not recall any substantive details about her intimate relationship or interactions with the defendant, including his alleged confession to her. Even after reviewing a transcript of her testimony from the defendant's first trial, she said that she did not remember testifying against him at the first trial. The defend-

ant's former girlfriend was excused as a witness, without the defense posing a single question to her.

Upon a motion by the People, the County Court directed a hearing during the course of the trial as to whether the defendant's former girlfriend was feigning her memory loss, and consequently whether she should be held in contempt. After the hearing, the court found that she "intentionally feigned memory loss in an unlawful attempt to evade answering lawfully posed questions after she took the witness stand and affirmed to tell the truth" (*Matter of Mayyhew*, 33 Misc 3d 1222[A], 2011 NY Slip Op 52054[U], *7 [2011], citing Judiciary Law § 750 [5]). Based on this finding, the court held her in contempt, and incarcerated her for a period of five days (*see Matter of Mayyhew*, 33 Misc 3d 1222[A], 2011 NY Slip Op 52054[U] [2011]). As pertinent to this appeal, the court found that the defendant's former girlfriend was unavailable within the meaning of CPL 670.10 because she had feigned her memory loss and, therefore, it permitted the People to admit her prior testimony from the first and third trials into evidence.

Under these particular circumstances, the County Court did not err in deeming the defendant's former girlfriend to be unavailable within the meaning of CPL 670.10, and in admitting her prior trial testimony into evidence (*see* CPL 670.10; *cf. People v Knowles*, 79 AD3d at 24; *People v Barber*, 2 AD3d 1290 [2003]; *People v Spencer*, 219 AD2d at 264; *cf. also People v Whitley*, 14 AD3d at 404; *People v Johns*, 297 AD2d at 646).

However, the County Court improvidently exercised its discretion in denying the defendant's motion for leave to introduce expert testimony on the issue of false confessions (*see People v Bedessie*, 19 NY3d 147 [2012]; *see also Frye v United States*, 293 F 1013 [DC Cir 1923]). Notwithstanding the defendant's extensive proffer, which included submissions from two experts, as well as the videotaped confession, the court summarily rejected his motion for leave to introduce expert testimony on the issue of false confessions, on the ground that this subject is "within the understanding of an average juror," and that other New York courts had held such testimony to be inadmissible.

In 2012, in *People v Bedessie*, the Court of Appeals first considered the "admissibility of expert testimony proffered on the issue of the reliability of a confession" (19 NY3d at 149), and observed that the "phenomenon of false confessions" is not only genuine, but has "moved from the realm of startling hypothesis into that of common knowledge, if not conventional wisdom" (*People v Bedessie*, 19 NY3d at 156; *see Commonwealth*

*v Hoose*, 467 Mass 395, 5 NE3d 843 [2014]; Dorothy Heyl, *The Limits of Deception: An End to the Use of Lies and Trickery in Custodial Interrogations to Elicit the "Truth"?*, 77 Alb L Rev 931, 931 [2013/2014]). The Court of Appeals referred to its 2001 decision in *People v Lee* (96 NY2d 157 [2001])—which considered the issue of the admissibility of expert testimony on the reliability of eyewitness identification—as "instructive" with respect to the question of whether expert testimony about false confessions is admissible in certain cases (*People v Bedessie*, 19 NY3d at 156).

In *Lee*, the Court of Appeals laid out "broad principles" governing the admissibility of expert psychological testimony. The Court reiterated these principles in *Bedessie*: " 'the admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court,' which should be guided by 'whether the proffered expert testimony would aid a lay jury in reaching a verdict'; 'courts should be wary not to exclude such testimony merely because, to some degree, it invades the jury's province'; '[d]espite the fact that jurors may be familiar from their own experience with factors relevant to the reliability' of the evidence at issue, 'it cannot be said that psychological studies' bearing on reliability 'are within the ken of the typical juror' " (*People v Bedessie*, 19 NY3d at 156, quoting *People v Lee*, 96 NY2d at 162). The Court of Appeals emphasized that "an expert's testimony, by its very nature, always to 'some degree . . . invades the jury's province', and so this circumstance alone is not an adequate basis for rejecting expert testimony" (*People v Bedessie*, 19 NY3d at 157, quoting *People v Lee*, 96 NY2d at 162).

In *Bedessie*, a 5-2 decision, the majority ultimately determined that the defendant's expert "had nothing to say that was relevant to the [particular] circumstances of th[e] case," and, therefore, the proffered expert testimony "would not assist the jury in evaluating the voluntariness and truthfulness of defendant's confession or reaching a verdict" (*People v Bedessie*, 19 NY3d at 157). However, the majority offered guidance as to the circumstances warranting the admission of expert testimony on false confessions, stating that research "in the area of false confessions purports to show that certain types of defendants are more likely to be coerced into giving a false confession—e.g., individuals who are highly compliant or intellectually impaired or suffer from a diagnosable psychiatric disorder" (*id.* at 159, citing Danielle E. Chojnacki et al., *An Empirical Basis for the Admission of Expert Testimony on False Confessions*, 40 Ariz St LJ 1, 15 [Spring 2008]).

Significantly, the majority opinion in *Bedessie* ended with this clear and powerful message: "False confessions that precipitate a wrongful conviction manifestly harm the defendant, the crime victim, society and the criminal justice system. *And there is no doubt that experts in such disciplines as psychiatry and psychology or the social sciences may offer valuable testimony to educate a jury about those factors of personality and situation that the relevant scientific community considers to be associated with false confessions.* While the expert may not testify as to whether a particular defendant's confession was or was not reliable, the expert's proffer must be relevant to the [particular] defendant and interrogation before the court" (*People v Bedessie*, 19 NY3d at 161 [emphasis added]).

Under *Lee* and *Bedessie*, it cannot be said that psychological studies bearing on the reliability of a confession are, as a general matter, "within the ken of the typical juror" (*People v Lee*, 96 NY2d at 162; *see People v Bedessie*, 19 NY3d at 156-157). Accordingly, it was error for the County Court to conclude that the issue of false confessions is within the understanding of an average juror and to preclude the proffered testimony on this ground. Further, under the circumstances of this case, the court improvidently exercised its discretion in denying the defendant's motion for leave to admit expert testimony on that subject.

Here, unlike the circumstances in *Bedessie*, the proffered expert testimony was relevant to this particular defendant and the particular circumstances of the case, including the approximately seven-hour interrogation, the videotaped confession, and the lack of physical evidence or eyewitness testimony linking the defendant to the crime (*see People v Bedessie*, 19 NY3d at 161; *People v Joubert*, 125 AD3d 686 [2015]; *cf. People v Roman*, 125 AD3d 515, 515 [2015]; *People v Rosario*, 100 AD3d 660, 661 [2012]).

In addition to reports from two relevant experts, the County Court was presented with a 75-minute video of the defendant's late-night confession, taken after the defendant was in custody for almost 14 hours and interrogated for approximately seven of those almost 14 hours. Among other things, the video shows that the defendant, whose hands were cuffed in front of him during the interview, spoke slowly and sat in a slouched position for a substantial portion of the interview. Further, the officers repeatedly employed suggestive and leading questions, fed the defendant specific details related to the crime scene, and used rapport-building techniques.

Dr. Jessica Pearson, a clinical and forensic psychologist,

interviewed the defendant, reviewed his educational and mental health records, and reviewed the videotaped confession. She opined that the defendant had intellectual deficits and personality traits that rendered him vulnerable to giving a false confession, especially where, as here, the police posed a number of suggestive or leading questions, the interrogation was particularly long, and the police used rapport-building techniques to gain the defendant's trust. With respect to her opinion that the defendant had borderline intelligence, Dr. Pearson reported that his full scale IQ was only 85 at age 14, and he was enrolled in special education classes in the ninth grade.

Dr. Pearson's records also reveal that the defendant had been hospitalized for mental illness on multiple occasions, and medication that he took to treat his lupus condition could cause or exacerbate psychiatric symptoms. Significantly, the day after his confession, the defendant was diagnosed with "psychosis not otherwise specified," and prescribed Haldol, an antipsychotic medication used to treat schizophrenia and acute psychosis. The defendant reported that the Haldol suppressed the voices he had been hearing, which permits a fair inference that he was suffering from auditory hallucinations at the time of his interrogation. Although the County Court permitted Dr. Pearson to testify at the defendant's trial about the discrete issue of whether the defendant was able to understand the *Miranda* warnings he was given (*see Miranda v Arizona*, 384 US 436 [1966]), she was not permitted to testify on the issue of false confessions.

The defendant's second proffered expert, Dr. Richard A. Leo, a psychologist who has both a Ph.D. in psychology and a J.D. degree, stated that he was an expert in the psychology of police interrogation, police interrogation techniques, psychological coercion, and false confessions. Consistent with Dr. Pearson's opinion, Dr. Leo opined that a number of individual and situational factors associated with the defendant's interrogation and confession created a heightened risk of a false confession in this case. Among other things, Dr. Leo observed that the confession did not fit the facts of the crime, and was not supported by physical evidence. He further discussed a number of factors present in this case that are associated with false confessions, including the defendant's low intelligence, high suggestibility, mental illness, and the extraordinary length of his custody and interrogation. Dr. Leo specifically opined that the defendant's "mental handicaps unquestionably left him especially vulnerable to the pressures of accusatory interroga-

tion, especially an interrogation as long as this one," and that this "put him at a high risk of giving or agreeing to a false confession."

Upon our consideration of the submissions and opinions of both experts, we find that the defendant made a thorough proffer that he was "more likely to be coerced into giving a false confession" than other individuals. His proffer clearly indicated that he was intellectually impaired, highly compliant, and suffered from a diagnosable psychiatric disorder, and also that the techniques used during the interrogation were likely to elicit a false confession from him (*People v Bedessie*, 19 NY3d at 159). Moreover, in light of the foregoing, the fact that no one had videotaped the nearly six hours of the interrogation that had been conducted before the confession was made raises significant concerns.

Further, there was little evidence to corroborate the defendant's confession in this case, and his conviction turned almost entirely on his videotaped confession (*cf. People v Bedessie*, 19 NY3d at 153-154, 157, 161; *People v LeGrand*, 8 NY3d 449, 452, 457-459 [2007]). There was no DNA or other physical evidence linking the defendant to the crime, and there was no eyewitness testimony. Although the County Court admitted into evidence prior trial testimony from the defendant's former girlfriend that, during an altercation between them in November 2000, he told her that he committed two murders, she did not report the defendant's statement to police for approximately three months, and she only reported the statement immediately after she had him arrested for allegedly violating an order of protection by approaching her home. This limited incriminating evidence did not undermine the usefulness of expert testimony on the issue of false confessions in this case.

For all of these reasons, the County Court improvidently exercised its discretion in denying the defendant's motion for leave to introduce expert testimony on the subject of false confessions. As the evidence in this case was not overwhelming, the court's error was not harmless (*see People v Crimmins*, 36 NY2d 230, 241-242 [1975]; *compare People v Rivers*, 18 NY3d 222, 228 [2011], *with People v McCullough*, 126 AD3d 1452, 1452-1455 [2015], *lv granted* 25 NY3d 1079 [2015]). Thus, this error warrants reversal and a new trial, at which the defendant, if he so chooses, will be permitted to present expert testimony on the issue of false confessions, to be preceded by a hearing to determine the scope of the expert testimony on the issue of false confessions.

Since there must be a new trial, we note that the County

Court improvidently exercised its discretion in permitting the People to belatedly amend the bill of particulars. The indictment and the initial bill of particulars alleged that the victims were killed between November 19, 1996, and November 21, 1996. At the defendant's first and second trials, the medical examiner testified that the time of death for both victims was within the range of two to three days prior to November 21, 1996, when the bodies were discovered. In connection with the defendant's CPL 440.10 motion to vacate the conviction after his second trial, he presented alibi witnesses to establish that he was not in New York State from November 19, 1996, through November 21, 1996, but, rather, was in Goldsboro, North Carolina during that time (*see People v Days*, 26 Misc 3d 1205[A], 2009 NY Slip Op 52667[U] [2009]).

Thereafter, in preparation for the defendant's third trial, the People prepared an amended bill of particulars reciting, in pertinent part, that "[b]ased upon medical evidence, witness statements and telephone records, these murders occurred two or three days prior to the discovery of the two bodies, including and encompassing the evening hours of *November 18, 1996*" (emphasis added). Thus, the People sought to extend the period during which the victims may have died to include November 18, 1996, knowing that the defendant's alibi witnesses previously indicated that the defendant was present in North Carolina beginning on November 19, 1996. The defendant moved to dismiss the indictment on the ground that the amendment deprived him of due process or, alternatively, to strike the amended bill of particulars, but that motion was denied in an order dated May 19, 2010. This significant amendment to the bill of particulars after 10 years had elapsed and two prior trials had been conducted in which the People alleged that the victims died between November 19, 1996, and November 21, 1996, substantially prejudiced the defendant, particularly because he secured alibi witnesses who testified that he was in North Carolina on those specific dates (*see* CPL 200.95 [8]).

Accordingly, the judgment must be reversed, and we remit the matter to the County Court, Westchester County, for a new trial in accordance with the findings and rulings contained in this decision and order. Mastro, J.P., Leventhal, Hall and Maltese, JJ., concur.