[32 NYS3d 119]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAN EVANS, Appellant.

First Department, May 19, 2016

## APPEARANCES OF COUNSEL

*Glenn A. Garber, P.C.*, New York City (*Glenn A. Garber* of counsel), for appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Susan Axelrod* and *Christopher P. Marinelli* of counsel), for respondent.

**OPINION OF THE COURT**

KAPNICK, J.

On this appeal, defendant principally argues that the trial court improvidently exercised its discretion in denying his motion to introduce expert testimony on the subject of false confessions. By indictment No. 5747/09, defendant was charged with second-degree murder, and second- and third-degree criminal possession of a weapon, relating to an August 16, 2006 incident in which he allegedly shot at one person, but instead hit and killed an innocent female bystander, in the street in Upper Manhattan (the 2006 homicide). By indictment No. 4382/09, defendant was charged with second-degree attempted murder, first-degree attempted assault, first- and second-degree assault, second-degree criminal possession of a weapon and first-degree reckless endangerment, relating to a June 15, 2009 incident at the East River Houses, a housing complex in Upper Manhattan, in which he allegedly was shooting at one person but hit and injured two bystanders (the 2009 incident). The indictments were joined upon motion by the People, which defendant also claims was error. Additionally, he contends that it was error for the court to deny his motion to suppress a lineup identification.

In June 2010, defense counsel requested that the court appoint Dr. Sandford Drob as an expert to conduct the psychological evaluation of defendant in regard to the confessions he provided to the police. The court initially denied defendant's request, but permitted him to make a more detailed application. In July 2010, defense counsel filed a supplemental affirmation stating that he was seeking the assignment of Dr. Drob to evaluate defendant regarding both his ability to waive his *Miranda* rights and his susceptibility to making a false confession. Counsel stated that he intended Dr. Drob to testify at trial about his assessment of defendant and generally on the subject of false confessions, including social scientific testimony about the phenomenon and causes of false confessions and tests like the Gudjonsson Suggestibility Scales (GSS), which measure a person's vulnerability to suggestion.

In response, the People objected to expert testimony on the general subject of false confessions and defendant's susceptibility to making a false confession, but did not object to assignment of an expert to evaluate defendant's ability to waive his *Miranda* warnings and/or to testify as to defendant's possible cognitive deficits.

On July 15, 2010, the court denied defendant's request for an expert on the "general subject of false confessions" and on the subject of "susceptibility to providing false confessions," but granted the application for appointment of an expert to conduct a psychiatric evaluation of defendant.

Dr. Drob subsequently interviewed and evaluated defendant and issued a forensic psychological evaluation on October 4, 2010, concluding:

> "Mr. Evans exhibits traits that would render him vulnerable to producing a false confession. These traits include borderline intellectual functioning, cognitive, social and emotional immaturity, severe deficits in reality testing and deficits in the capacity to understand the actions and intentions of others, deficits in his capacity to cope with interpersonal stress, anxiety, depression, dependency, passivity and a desire to please others, and a concomitant tendency to rely on others for direction and support."

In April 2011, defense counsel again requested leave to introduce expert testimony at trial on the issues of the general phenomenon of false confessions and defendant's susceptibility to making a false confession. Defense counsel also moved to assign Dr. Maria Hartwig as a false confession expert, or alternatively, for a *Frye* hearing on the admissibility of that expert testimony. Defense counsel proposed that if Professor Hartwig were permitted to testify, Dr. Drob's testimony would be limited to the tests he performed on defendant, the results he obtained and his opinion about defendant's susceptibility to making involuntary and/or unreliable confessions, without his opining as to whether defendant's confessions were false. Alternatively, counsel proposed, if Dr. Hartwig was not assigned, Dr. Drob should be permitted to testify as an expert on false confessions.

The People opposed the motion, noting that five New York courts had previously held *Frye* hearings on this subject and found that the science of false confessions was not generally accepted within the scientific community. The People maintained that there was no basis for Dr. Drob to conclude that particular traits that defendant possessed would make him more susceptible to making a false confession.

On June 2, 2011, prior to jury selection, the court ruled that it would not permit Dr. Drob to testify about the phenomenon of false confessions.

At trial, Dr. Drob was permitted to testify as to the testing he had performed on defendant, including the GSS tests, showing that defendant had limited cognitive ability and borderline intellectual functioning. He testified that the tests demonstrated that defendant was very suggestible and relatedly that he was willing to fabricate when pressed for information that he did not possess. He opined that defendant had a strong desire to please others, especially authority figures. Further, when asked to summarize his findings, he testified:

> "I would also say that in general based upon all of the information that because of his low IQ, because of his passivity, his dependence, because of his poor reality testing, his poor social relatedness and also his difficulty coping with stress, that this is an individual who would be more so than other people vulnerable to manipulation by other individuals."

When defense counsel asked Dr. Drob how defendant would be affected if he was placed in a room in isolation with only his interrogators who repeatedly said to him that they knew he was lying, the court sustained the People's objection.

■ " '[T]he admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court,' which should be guided by 'whether the proffered expert testimony would aid a lay jury in reaching a verdict' " (*People v Bedessie*, 19 NY3d 147, 156 [2012], quoting *People v Lee*, 96 NY2d 157, 162 [2001]). Here, the court permitted defendant's expert to testify on certain matters relating to defendant's mental condition and his intellectual capacity, but did not allow any expert testimony on the general phenomenon of false confessions or how defendant's specific individual personality traits may have contributed to a false confession. Unlike the case in *Bedessie*, where the Court held that the expert's proffer was not "relevant to the defendant and [the] interrogation before the court" (*Bedessie*, 19 NY3d at 161), here we find that defendant meets this threshold requirement.

First, there is no dispute that Dr. Drob concluded that defendant exhibited traits such as,

> "borderline intellectual functioning, cognitive, social and emotional immaturity, severe deficits in reality testing and deficits in the capacity to understand the actions and intentions of others, deficits in his capacity to cope with interpersonal

> stress, anxiety, depression, dependency, passivity and a desire to please others, and a concomitant tendency to rely on others for direction and support."

There can also be no dispute that these particular mental conditions and personality traits are ones that research studies have linked to false confessions, and that the Court of Appeals has recognized this link (*Bedessie*, 19 NY3d at 159 ["Research in the area of false confessions purports to show that certain types of defendants are more likely to be coerced into giving a false confession—e.g., individuals who are highly compliant or intellectually impaired . . . or who are for some other reason psychologically or mentally fragile"]).

Second, certain conditions of the interrogation suggest that defendant could have been induced to confess falsely to the crimes at issue. The defense urges that the detectives' interrogation employed a variety of techniques that scientific research has shown to be highly correlated with eliciting false confessions. As was the case in *People v Days* (131 AD3d 972 [2d Dept 2015], *lv denied* 26 NY3d 1108 [2016]), defendant here was subjected to a lengthy interrogation, from around 11:00 a.m. until his final videotaped statement shortly before midnight. Moreover, as in *Days*, the evidence here suggests that the interrogating detectives utilized rapport-building techniques to gain defendant's trust and posed a number of suggestive or leading questions during the interrogation. Further, "the fact that no one had videotaped the [many] hours of the interrogation that had been conducted before the confession was made raises significant concerns" (*id*. at 981).[1]

Finally, this is a case, especially with respect to the 2006 homicide, that turns on the accuracy of defendant's confessions. There was no physical evidence connecting defendant to the 2006 homicide, and, although there was testimony from various witnesses describing the scene of the homicide, as well

---

**1.** The dissent's attempt to distinguish *People v Days* from the instant case because there was virtually no corroborating evidence in that case does not render the case inapposite. The Court of Appeals has not issued a bright-line rule that false confession experts may only testify in cases where the only evidence of guilt is the defendant's confession. Instead, the Court of Appeals has instructed that expert testimony on false confessions is permissible when it is relevant to the particular defendant and interrogation at hand, which must be judged on a case by case basis (*Bedessie*, 19 NY3d at 161). *People v Days* is instructive, especially in reviewing the interrogation conditions, which even the dissent concedes bear resemblance to the conditions in the instant case.

as testimony from a cab driver who was acquainted with defendant from the neighborhood, and drove defendant to the vicinity where the crime took place, this evidence was not overwhelming. Contrary to the dissent's broad assertion that there was sufficient evidence corroborating defendant's confession, the testimony in fact only corroborated defendant's description of the scene; there were no witnesses or any other evidence, however, to corroborate defendant's confession to firing the gun. One witness testified that upon approaching his apartment building on 117th Street, he noticed a group of men using a laptop on the hood of a car, and after arriving at his third floor apartment he heard three or four gunshots. Two other witnesses, who were with the victim at the time of the shooting, described the scene of the shooting, including the fact that a group of Hispanic men using a laptop were gathered around a car. However, both witnesses testified that they did not see the shooter. A fourth witness testified that she did see the shooter, but could not describe him other than saying he was a young man wearing a black shirt and black hat.

There can be no dispute that the relevant inquiry here is whether the confession was corroborated by overwhelming evidence, thereby undermining the usefulness of expert testimony on the issue of false confessions. Despite the dissent's assertion otherwise, this standard is not met by simply reasoning that "if defendant confessed to one crime that he actually committed, there is no reason to suspect that his confession to the August 2006 crime . . . was not equally reliable." While this may be an argument that the People could make to the jury at trial in support of the reliability of the confession, it does not refute the fact that the confession was a central component of the People's case, and thus does not undermine the usefulness of expert testimony on the issue of false confessions (*see Days*, 131 AD3d at 981).

Moreover, the dissent's assertion that reversal here is not warranted in light of the overwhelming evidence corroborating the confession blatantly disregards the standard we are tasked to apply, as defined by *Bedessie*, which asks us to examine whether the proffered expert testimony is warranted based on the nature of the interrogation, the applicability of the science of false confessions to the defendant and the extent to which the People's case relied on the confession. All three factors must be considered and weighed to determine the admissibility of the expert testimony on false confessions. It is not for this

Court to ponder the veracity of the confession by comparing the details given in the confession with the details contained in the witnesses' testimony. Only the factfinder can engage in that analysis and make the inferences that the dissent suggests should be made, and the jury is free to consider the details of defendant's confession, along with the details described by the witnesses and decide whether the People met their burden of proof.

We agree with the dissent that identification testimony is not an absolute requirement for a conviction; certainly there are many ways in which the People may decide to prove their case. Further, we appreciate that the witnesses in the 2006 case may not have been able to identify the shooter due to the fast-paced and hectic nature of the events, which resulted in the tragic and unfortunate death of an innocent bystander. However, these realities, despite the dissent's reasoning otherwise, do not have any legal bearing on the disposition of this appeal. While the dissent maintains that we've taken a "myopic view of the evidence" to reach our conclusion, we submit that the only reasonable view of the evidence supports the notion that without independent physical or testimonial evidence linking defendant to the crime, the People relied heavily on defendant's confession to secure a conviction. In light of this, and after considering the other two factors, we find that the jury is entitled to the benefit of hearing expert testimony on false confessions so that the jurors may consider it alongside the other evidence.

In addition, although the People assert that defendant's confession in the 2009 incident was sufficiently corroborated by eyewitness testimony, and they did not need to rely on it to meet their burden, the confession still undoubtedly played a central role in the People's case. While we agree with the dissent that there was also physical evidence in the 2009 case, namely the cartridge cases from two different guns that were recovered at the scene, we disagree that the cases are direct evidence of defendant's guilt, or otherwise corroborate defendant's confession. Likewise, the fact that defendant suffered a gunshot wound and that he appears in surveillance video is evidence that he was at the scene, but not that he was the shooter. The People's direct evidence that he was the shooter, other than his confession, came from eyewitness testimony of William Smith, the 11-year-old victim and bystander, who testified that defendant fired a gun, causing Smith to run toward

his apartment, at which time he was shot in the ankle. While the corroborating evidence in the 2009 incident is certainly stronger than that in the 2006 case, it, again, does not undermine the usefulness of expert testimony on the issue of false confessions (*see Days*, 131 AD3d at 981) and is not dispositive of the issue at hand, especially here, where defendant was tried for both the 2009 incident and the 2006 homicide in a consolidated trial.

Based on the foregoing, defendant meets the standard set out by the Court of Appeals—that the proposed expert's testimony is "relevant to the defendant and [the] interrogation before the court" (*Bedessie*, 19 NY3d at 161; *cf. People v Roman*, 125 AD3d 515 [1st Dept 2015], *lv denied* 26 NY3d 1091 [2015] [where the trial court properly denied the defendant's motion to present expert testimony on false confessions when his motion papers contained no expert affidavit and the case did not turn on the accuracy of the defendant's confession]).

The dissent's reliance on *Roman*, for the notion that "there is no reasonable possibility that the proposed testimony would have resulted in a more favorable verdict," is misplaced (125 AD3d at 516). In *Roman*, the defendant testified at trial and his allegedly false confession was "generally exculpatory with respect to the issue of intent" (*id.*). Although the dissent is correct that Dr. Drob was permitted to testify about defendant's personality traits and that he was susceptible to manipulation, it cannot be said that the proffered expert testimony linking those traits to the phenomenon of false confessions would not have had a reasonable possibility of resulting in a more favorable verdict.

■ To the extent the denial was based on the People's argument that the science of false confessions is not generally accepted within the scientific community, the Court of Appeals has now made clear that the "phenomenon of false confessions is genuine [and] has moved from the realm of startling hypothesis into that of common knowledge, if not conventional wisdom" (*Bedessie*, 19 NY3d at 156).[2] As observed by the New York State Bar Association Task Force on Wrongful Convictions, "Both social science research and anecdotal evidence of wrongful convictions have demonstrated that false confessions do occur" (Final Report of the New York State Bar Association's

---

2. The Court of Appeals has also made clear that the fact that this type of expert testimony may be within the understanding of the average juror is not an adequate basis for rejecting it (*Bedessie*, 19 NY3d at 157).

Task Force on Wrongful Convictions at 112 [Apr. 2009], https://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26663 [accessed Apr. 29, 2016]). Moreover, "[e]xpert testimony on false confessions may be a defendant's strongest piece of evidence when challenging the state's case" (Chojnacki, Cicchini & White, *An Empirical Basis for the Admission of Expert Testimony on False Confessions*, 40 Ariz St LJ 1, 12 [2008]). As the Court of Appeals found, "[T]here is no doubt that experts in such disciplines as psychiatry and psychology or the social sciences may offer valuable testimony to educate a jury about those factors of personality and situation that the relevant scientific community considers to be associated with false confessions" (*Bedessie* at 161). Indeed, there are "factors or circumstances correlated by psychologists with false confessions" (*id.* at 158). Therefore, "expert evidence on [the] factors that the scientific community has determined may contribute to a false confession" (*id.* at 156) is warranted in the proper case. Although the trial court did not have the benefit of the *Bedessie* decision at the time of its ruling, it cannot now be said that expert testimony that is relevant to the defendant and the interrogation before the court may be precluded because the science of false confessions is not generally accepted in the scientific community.

Accordingly, the court improvidently exercised its discretion in denying defendant's motion to present expert testimony on false confessions to assist the jury in connecting the unique factors present in defendant's interrogation with the scientific research linking those factors with false and unreliable confessions, and a new trial is warranted. While we are certainly mindful of the fact that a trial court is vested with the discretion to determine the admissibility and limits of expert testimony, here, the court summarily rejected defendant's motion to introduce expert testimony on the issue of false confessions, solely on the grounds that the science of false confessions was not generally accepted within the scientific community, without undertaking any analysis or otherwise weighing the relevant legal issues.

As to defendant's remaining arguments, the court properly granted the People's motion to consolidate the indictments relating to the two incidents (*see* CPL 200.20 [2] [b], [c]). The court also properly found that the lineup relating to the attempted murder incident was not unduly suggestive (*see People v Chipp*, 75 NY2d 327, 336 [1990], *cert denied* 498 US 833

[1990]). We need not reach defendant's argument regarding the excessiveness of his sentence.

Accordingly, the judgment of the Supreme Court, New York County (Carol Berkman, J.), rendered June 22, 2011, as amended July 19, 2011, convicting defendant, after a jury trial, of murder in the second degree, attempted murder in the second degree, assault in the first and second degrees, attempted assault in the first degree, criminal possession of a weapon in the second degree (two counts) and criminal possession of a weapon in the third degree, and sentencing him to an aggregate term of 40 years to life, should be reversed, on the law, and the matter remanded for a new trial in accordance herewith.

Tom, J.P. (dissenting). Substantial evidence corroborating defendant's confession to each of the two shootings removes any doubt regarding its reliability and obviates any legitimate concern that defendant gave a confession to a crime he did not commit. Also, because defendant's psychiatric expert was permitted to testify as to defendant's vulnerability to be manipulated by another person, especially one of authority, the trial court providently exercised its discretion in denying defendant's request to introduce expert testimony on the phenomenon of false confessions. Therefore, I respectfully dissent.

Defendant sought treatment for a bullet wound to the leg at the emergency room of Harlem Hospital on the afternoon of June 15, 2009. This information was reported to Detective Robert Mooney, who had been investigating the August 16, 2006 shooting death of a young female, Lesenia Figueroa, on 117th Street in Harlem. Mooney had come to suspect that defendant was involved in the victim's death, although the basis for the detective's suspicion has not been explained.

At the hospital, defendant told Detective Mooney that he was on the basketball court at the East River Houses when two people began shooting at each other. Everyone started running and so did defendant. Realizing that he had been shot, defendant took a cab to Harlem Hospital. Two other people also sustained gunshot wounds. Seventy-seven-year-old Pedro Morales was shot in the hip and 11-year-old William Smith was hit in the ankle.

On June 15, 2009, at about 2:43 p.m., security cameras at the New Metro North Housing Complex captured images of Marcel Baker walking through the lobby of 1952/1954 First

Avenue. He was accompanied by a second man who was black and wore a red jacket with white lettering on the front and back, blue jeans and white sneakers. Exterior surveillance cameras showed the two men walking towards First Avenue.

A police officer responding to a report of shots fired at the housing complex spoke with young William Smith, who described his assailant as a heavy-set, black male wearing a red jacket. His hair was "nappy" or in corn rows. Smith later identified defendant from a photo array.

On August 21, 2009, following defendant's release from the hospital, three detectives went to his apartment arriving at about 11:00 a.m. Defendant voluntarily accompanied them to the 23rd Precinct, where he was brought into an interview room and offered something to eat and drink, which he declined. When asked about the shooting, defendant essentially repeated the statement he had made to Detective Mooney at Harlem Hospital adding that he ran to First Avenue, where he encountered a woman he knew, and she accompanied him to the hospital. A detective explained that the investigation of the incident had revealed that defendant was one of the shooters and read defendant his *Miranda* warnings.

Defendant waived his *Miranda* rights and, according to Detective Vito Ragolia, stated, "I'm going to be honest with you. I'm going to tell you what happened." Thereupon, defendant recounted that, after arguing with his girlfriend, he went outside to cool off. He met his friend Marcel, and they went to the East River basketball courts to smoke marijuana. A man defendant identified as "Peanut" approached them in a very agitated state and asked defendant if he had any marijuana. When told he had none, Peanut walked away. Defendant related that when he saw Peanut, wearing a black hoody, dark clothes and gloves, reenter the basketball courts and raise his hand, he retrieved a gun from a nearby garbage can. Defendant explained that the garbage can was used by neighborhood drug dealers to secrete weapons, a fact that he asserted was "common knowledge." Defendant then began firing at Peanut. Afterwards, he ran toward First Avenue and realized he had been shot. He met a girl known as Re-Re, who hailed a cab to take them to Harlem Hospital. During his statement, defendant was not confrontational and did not give any of the detectives a reason to raise his voice.

Detective Ragolia expressed disbelief that drug dealers would hide a weapon in an area where small children play and told

defendant that he wanted to take his statement. Defendant expressed his preference that the detective write the statement for him as he gave it. Defendant signed the statement, after which the detectives asked defendant if he needed anything and informed him that they would be taking a break, leaving the interview room at about 2:45 p.m. At some point during the afternoon, defendant was given two brownies and a bottle of water.

Detective Ragolia resumed the interview at about 3:45 p.m. and concluded between 5:00 and 5:30 p.m. He was accompanied by Detective Mooney, who told defendant that witnesses had described him removing a gun from his waistband and firing first. Defendant then admitted that he had taken a pistol from a pocket in his jeans and, when Peanut returned to the basketball courts with a gun, decided not to wait for him to fire a shot but shot first, discharging his weapon several times before throwing it into the bushes. Detective Mooney wrote down the statement from memory, asking for clarification when necessary. When told that the police had searched the entire area and found no weapon, defendant said that he had disposed of the gun in the garbage chute of a building he ran into before hailing the cab to go to the hospital. After defendant read and signed each page of his statement, the detective asked if defendant would be willing to meet with the prosecutors assigned to the case.

The meeting with prosecutors began at about 6:10 p.m. Defendant gave a videotaped statement repeating in substance what he had just related to Detective Mooney. Defendant stated that he was wearing a red jacket, white tee shirt and blue jeans and that Peanut was dressed in black. He described how he took his gun from his jeans and Peanut produced his gun from the pouch of his hoody. The videotaped statement ended at 6:42 p.m.

At this juncture, Detective Mooney informed defendant that he was under arrest and that a lineup would be conducted for witnesses to the shooting. He explained that defendant "had a much bigger problem regarding the homicide of a young girl killed on 117th Street three years earlier," meaning the 2006 Figueroa homicide, and that people who had picked him out of a photo array would also be present at the lineup. He told defendant to relax for a few minutes while he attended to some paperwork. But before he could open the door, defendant stated, "I didn't mean to kill her."

When Detective Mooney again entered the interview room, he carried with him files concerning unrelated investigations, which contained photographs of people from the neighborhood including some depicting Joshua Mirabel and Angel Garcia. The detective asked defendant if he could identify any of these people, and defendant demonstrated that he was familiar with most of them. Detective Mooney then stated that the only way he was going to find out what happened in the Figueroa shooting was if defendant told him.

Defendant explained that two nights prior to the 2006 shooting, he was on the east end of 100th Street when Angel Garcia and two men drove up. The men got out, guns drawn, and Garcia put a gun in defendant's mouth while the other two took his shoes, belt, money and cell phone. The following night, Josh Mirabel and some friends were at the playground by defendant's apartment building when Mirabel's phone rang indicating a call coming from defendant's stolen cell phone. Shortly thereafter, Angel Garcia approached, drew a pistol and opened fire, striking Mirabel in the shoulder.

The next night, defendant discussed these events with Mirabel's brother, "Fach," while smoking marijuana. They hired a cab driver who lived in the Metro North Houses (the New Metro North Housing Complex), known as "Little Arab," to drive them around. They directed him to 117th Street, where defendant saw Garcia and others, including some women, gathered around a laptop that was resting on the hood of a car. According to defendant, they retrieved a gun from a mailbox at the Isaacs Houses on 92nd Street and First Avenue and returned to the scene, where defendant got out and approached Garcia and his companions. Garcia ran off, at which time defendant fired five or six shots before returning to the cab, instructing the driver to continue to drive around while defendant and Fach continued to smoke. Defendant ultimately left the gun with Fach, who disposed of it. Defendant said that he had not intended to kill Figueroa and only learned that someone had been killed by reading the newspaper.

Detective Mooney reduced defendant's statement to writing and gave it to him to review and sign. Defendant then consented to again give a videotaped statement to a prosecutor. In that statement, which began at approximately 11:15 p.m., defendant repeated what he had told the detective, adding that he had intended to threaten Garcia with the gun as Garcia had threatened him, but when Garcia and his friends ran away, de-

fendant began shooting. The interview was concluded at 11:47 p.m. Defendant was detained in a holding cell at the precinct house overnight.

On August 22, 2009, the following morning, William Smith, accompanied by his mother, arrived to view two lineups concerning the shooting of June 15, 2009. He identified defendant in the first lineup as the shooter wearing the red jacket and Tyrone Howard, also known as Peanut, in the second lineup as the shooter wearing the black jacket.

William Smith lived at the East River Housing Complex, just north of the New Metro North Housing Complex, which was close to the school he attended. Smith had seen Tyrone Howard at his apartment complex and had observed defendant in front of his school on several occasions. On the night he was shot, Smith saw Howard, followed by defendant, walk past him toward the park at the rear of the East River complex. When Howard reached the end of one basketball court, defendant, positioned at the other end of the court, pulled a gun, which Smith recognized as a 9 millimeter, from the back of his waistband, opening fire in his direction and shooting at Howard. As he ran toward his apartment, Smith realized he had been shot in the ankle. He heard about 17 shots in all, after which he saw defendant run toward 434 East 105th Street.

At that time, Tamara Sepulveda looked out her living room window and saw defendant, whom she identified in court, approaching the apartment building. He appeared to be trying to run but was hampered by a leg injury. Defendant entered the building and reappeared a few minutes later dressed in different clothing, which she could not describe.

When Smith arrived at his apartment building, he was unable to enter and began shouting for someone to open the door. He was heard by Monique Burns, who called 911. She looked out her window observing a man wearing a hooded sweatshirt and blue jeans and holding a gun, which he put in his pocket as he walked to the back of the building.

Officers, from the evidence collection unit, recovered 13 cartridge cases from the basketball courts, all 9 millimeter. Four were found at the south entrance where Smith had been sitting with a friend. Three were found near the basketball hoop by the fence at one end of the court together with two on the walkway. Four more cases were recovered from the opposite end of the basketball court. Examination revealed that

the cases came from two different weapons. One gun had ejected the nine cases recovered from the end of the basketball court near the fence, and the second gun had ejected the four cases found at the other end of the court. This confirms Smith's observation of defendant and Howard firing shots from opposite ends of the basketball court.

Defendant was indicted in connection with both the 2009 shooting and the 2006 shooting resulting in the death of Lesenia Figueroa. The indictments were consolidated over defendant's objection, and a jury found him guilty of murder in the second degree, attempted murder in the second degree, assault in the first degree, attempted assault in the first degree, assault in the second degree, two counts of criminal possession of a weapon in the second degree and one count of criminal possession of a weapon in the third degree. He was sentenced to an aggregate prison term of 40 years to life.

With regard to the shooting of Lesenia Figueroa, the jury heard testimony from Sushil Kumar Sharma, who from his work as a cab driver in the neighborhood was acquainted with defendant, Joshua Mirabel and his brother, Fach. On the night of Figueroa's death, Sharma drove defendant and Fach to 116th Street and First Avenue near the location of the shooting and killing of the young female victim, where he waited. He did not hear any shots, but about five minutes later they returned, and he drove them back to the New Metro North Housing Complex.

Two other witnesses, Louis Pichardo and John Martinez, described a group of Hispanic men gathered around a laptop placed on the hood of a car. That night, Eric Garrison on his way home also observed a group of men using a laptop on the hood of a car. At about 8:45 p.m., Lesenia Figueroa stopped to greet Pichardo and Martinez on her way to a local bodega on First Avenue. After making a purchase, she returned to where they were seated and sat down with them. When the men heard shooting, they stood up to run away, and Pichardo took Figueroa by the hand in an attempt to take her with him. Kajina West, who had just walked out of the bodega, saw Figueroa trying to get up. She observed a man standing in the street shooting toward a group of Hispanic men in white shirts running away. She also saw the shooter wearing a black shirt and black hat. Four 9 millimeter cartridge cases were recovered from the vicinity, all from the same gun. Figueroa had sustained a fatal bullet wound to the back of her head.

Defendant's primary contention on appeal is that the trial court improperly refused to allow expert testimony on the

subject of false confessions. He relies on *People v Bedessie* (19 NY3d 147, 149 [2012]), in which the Court of Appeals endorsed the use of such testimony "in a proper case."

While the trial court did not permit the use of expert testimony concerning false confessions, it did allow a psychiatric evaluation of defendant by his proposed expert, Dr. Sanford Drob.[1] At trial, Dr. Drob testified that the tests he administered to defendant revealed limited cognitive ability and borderline intellectual functioning. Further, the tests demonstrated that defendant was very suggestible and willing to confabulate when pressed for information that he did not possess. Dr. Drob opined that defendant had a strong desire to please others, particularly authority figures. He concluded that

> "based upon all of the information that because of his low IQ, because of his passivity, his dependence, because of his poor reality testing, his poor social relatedness and also his difficulty coping with stress, that this is an individual who would be more so than other people vulnerable to manipulation by other individuals."

On summation, defense counsel argued that the police manipulated a confession from defendant, who was "borderline mentally retarded." The court instructed the jury that the People were required to prove, beyond a reasonable doubt, that defendant's statements were voluntarily made, providing instruction on how the jury should assess voluntariness in light of possible coercive police activity and defendant's intelligence and mental condition.

There is no merit to defendant's assertion that expert testimony concerning the personality traits and other factors and circumstances that psychiatrists correlate with false confessions was required here. As the majority recognizes, " '[T]he admissibility and limits of expert testimony lie primarily in the sound discretion of the trial court' " (*People v Bedessie*, 19 NY3d at 156, quoting *People v Lee*, 96 NY2d 157, 162 [2001]). Given the substantial evidence corroborating the confession, as well as the fact that the jury heard evidence from defendant's medical expert on defendant's susceptibility to manipulation and limited cognitive ability, it cannot be said

---

**1.** Defendant supplemented his application with a request that Dr. Maria Hartwig be appointed as an expert on false confessions and their etiology, which the court denied.

that the court improvidently exercised its discretion. Stated another way, I "decline to second-guess the court's exercise of discretion as this is not a case that turns on the accuracy of defendant's confession with little or no other evidence connecting him to the crimes of which he was convicted" (*People v Roman*, 125 AD3d 515, 516 [1st Dept 2015], *lv denied* 26 NY3d 1091 [2015]).

There is ample evidence corroborating defendant's confession to the June 15, 2009 shootout with Tyrone Howard. The jury was free to credit the testimony of the People's eyewitness, William Smith, who as a neighborhood resident was familiar with both shooters and had observed defendant in the neighborhood on numerous occasions. In addition, security footage showed Marcel Baker and defendant, dressed in his distinctive attire, walking together in the direction of the basketball courts prior to the shooting. Smith saw defendant following Howard into the basketball courts immediately before gunfire erupted and saw defendant firing gunshots toward him and at Howard. Shell casings verified the relative positions of the two shooters. Tamara Sepulveda saw defendant with an apparent leg wound enter her building and emerge wearing different attire, and Monique Burns saw a man wearing a hooded sweatshirt put a gun into his pocket as he passed her apartment building. Finally, defendant was treated at Harlem Hospital for a gunshot wound to the leg. The inescapable conclusion is that defendant confessed to a crime for which there is ample evidence establishing his culpability (*see Bedessie*, 19 NY3d at 157). Contrary to the majority's characterization that defendant's confession concerning the 2009 shooting was not supported by overwhelming evidence, the defendant's confession was corroborated not only by multiple witnesses who identified defendant as the shooter but also by physical evidence, including cartridge cases and defendant's own gunshot wound, as well as by video footage. This is clearly overwhelming evidence connecting defendant to the shooting incident in 2009. Moreover, if defendant confessed to one crime that he actually committed, there is no reason to suspect that his confession to the August 2006 crime resulting in the death of Lesenia Figueroa, also corroborated by ample evidence, was not equally reliable.

Further, there was ample evidence corroborating defendant's confession to the August 2006 fatal shooting. The cab driver, who knows defendant from the neighborhood, drove defendant

to the crime scene area, waited for a short time (approximately five minutes) for his return, and then immediately drove him away. Defendant's confession in which he described the shooting in detail was corroborated by the testimony of four eyewitnesses. Defendant confessed to detective Mooney that after he departed from Sharma's cab he approached Garcia, the intended target, who was with others gathered around a laptop on the hood of a car. He then fired five or six shots at Garcia and his companions as they fled. Defendant told the detective that Figueroa, an innocent bystander, was not the intended target and that, "I didn't mean to kill her." The details concerning the shooting and accidental killing of Figueroa as described by defendant were corroborated by the testimony of eyewitnesses Garrison, Pichardo, Martinez and West who gave the exact detailed description of sequence of events leading up to the shooting that night.

The majority attempts to minimize the evidence corroborating defendant's confession to the 2006 crime by focusing on the fact that none of the witnesses were able to identify defendant as the shooter. This ignores that this was a very fast moving event during which the witnesses were trying to escape with their lives and could not take the time to stop and look at the shooter carefully. It was unfortunate that Figueroa could not escape fast enough. Indeed, Martinez and Pichardo stated that they started running the moment they heard gunfire, and West, who was able to describe only the shooter's attire and complexion, explained that she was forced to quickly run into a store because a bullet had just ricocheted off a nearby lamppost. In any event, identification testimony is not an absolute requirement, and defendant's confession was corroborated in detail by testimony of eyewitnesses such that a jury could and did reasonably decide that defendant was the shooter in the 2006 crime. In other words, if defendant was not the shooter, one wonders how he was able to relate such specific details about the shooting in his confession.

The majority's conclusion that the corroborated testimony of eyewitnesses and physical evidence do not support defendant's confession and his conviction is based on a myopic view of the evidence. Simply, if defendant was not the shooter, how did he know his intended target (Garcia) was with a group of men gathered around a laptop on the hood of a car that night? That exact description of the scene was given by Garrison, who testified that it was "peculiar" that the men were outside of the car

because it was hot "summer weather" and "most people" would sit in their cars and put on the air conditioning while using their laptops. If defendant was not involved, how did he learn that the shooter fired at the group of men as they ran off as witnesses observed? And how did he know Figueroa was not the intended target but an innocent bystander who was mistakenly shot and killed as corroborated by the testimony of Pichardo, Martinez and West?

Defendant also confessed to firing around five or six shots in the 2006 crime. Garrison, Pichardo, Martinez and West all testified to hearing four or more gunshots; Pichardo thought it was four gunshots, Martinez thought it was four or five, and West thought it was five or six. Crime scene detectives also determined that four cartridge cases recovered at the scene had all been fired from the same gun. In sum, very specific details about the crime contained in defendant's confession were corroborated by both physical evidence and the witnesses' testimony.

The majority charges that discussing the detailed evidence corroborating defendant's confession and concluding that reversal is not warranted based on such evidence "disregards the standard we are tasked to apply." However, in considering the factors outlined in *Bedessie*, the majority gives little or no consideration to the evidentiary corroboration of a confession, a factor discussed in *Bedessie* and one which this Court focused on in *Roman*. Contrary to the majority's suggestion, the point of discussing the substantial corroborating evidence in this case is not for this Court to make a determination about whether defendant is guilty or about the "veracity of the confession." Rather, as was the case in *Bedessie* and *Roman,* the fact that defendant's confession was corroborated by substantial evidence distinguishes this matter from those in which there is "little or no other evidence connecting [a defendant] to the crimes of which he was convicted" (*Roman*, 125 AD3d at 516). The substantial corroborating evidence and psychiatric testimony of defendant's vulnerability to manipulation support the conclusion that this was not a "proper case" requiring the use of expert testimony on the subject of false confessions.

Moreover, the trial court's ruling to permit Dr. Drob to testify to his findings including defendant's limited cognitive and borderline intellectual functionings and his susceptibility to manipulation by other individuals was more than adequate proof to give the issue to the jury of whether defendant gave

false confessions. Thus the trial court's denial of defendant's application to offer an expert witness on false confession was properly denied.

*Bedessie* made clear that expert testimony on the science of false confessions may be helpful to the jury and appropriate where it is "relevant to the defendant and interrogation before the court" (19 NY3d at 161). However, *Bedessie* does not mandate such expert testimony in every case involving confessions, and did not remove a trial court's ability to exercise its discretion regarding the admission of expert testimony. Although the trial court summarily rejected the request to introduce a general confessions expert on the belief that the science of false confessions was not generally accepted within the scientific community, because the confession was corroborated by significant evidence and because Dr. Drob was permitted to testify about defendant's susceptibility to manipulation, the trial court did not abuse its discretion.

Crucially, the question of the validity of defendant's confessions was squarely presented to the jury (*id.* at 158). The court permitted Dr. Drob to testify that defendant was "more so than other people vulnerable to manipulation by other individuals," which is the practical limit of an expert's testimony without usurping the function of the jury to assess the evidentiary value of the confession. Thus, "there is no reasonable possibility that the proposed testimony would have resulted in a more favorable verdict" (*People v Roman*, 125 AD3d at 516).[2] The testimony that defendant would have apparently preferred to introduce was an expert opinion that his particular statements to police were unreliable, but such testimony clearly exceeds the limits of expert opinion and is not permissible (*Bedessie*, 19 NY3d at 161).

If expert testimony regarding false confessions were to be required in cases such as this, given the substantial corroborating proof concerning the 2006 and 2009 shootings, it would be tantamount to requiring expert testimony in every case where a defendant admits to involvement in a crime and would open up the floodgates of a new dimension of litigation concerning confessions, an untenable result.

---

2. The majority claims that reliance on *Roman* for this proposition is misplaced. They are mistaken. As the majority recognizes, Dr. Drob testified about defendant's personality traits and susceptibility to manipulation. Combined with the fact that substantial evidence corroborates defendant's confession, it is unlikely that the additional proposed testimony would have resulted in a more favorable verdict.

The majority's reliance on *People v Days* (131 AD3d 972 [2d Dept 2015], *lv denied* 26 NY3d 1108 [2016]) is inapposite. While there are some similarities between *Days* and this matter, including a lengthy interrogation faced by the defendant and the centrality of the confessions to the cases, the evidence in *Days* included neither physical evidence nor eyewitness testimony connecting the defendant to the crime. In contrast, such evidence was amply presented in this case to link defendant to the two crimes. Further, there is no indication that the trial court in *Days* permitted any psychiatric or psychological evidence regarding the defendant's intelligence or suggestibility to be presented to the jury. Again, the jury in this matter heard detailed testimony from Dr. Drob on those very points. In addition, although the majority raises a concern about the failure to videotape the interrogation conducted before the confession, "the neglect to record [an interview] is not a factor or circumstance that might induce a false confession" (*Bedessie*, 19 NY3d at 158). Finally, contrary to the majority's implication, I am not suggesting that there is a bright-line rule regarding the permissibility of false confession experts; I am instead suggesting that whether expert testimony is permissible should be judged on a case by case basis, and that the trial court providently exercised its discretion in this particular matter.

Accordingly, I would affirm the judgment of conviction.

RENWICK and MOSKOWITZ, JJ., concur with KAPNICK, J.; TOM, J.P., dissents in a separate opinion in which ANDRIAS, J., concurs.

Judgment, Supreme Court, New York County, rendered June 22, 2011, as amended July 19, 2011, reversed, on the law, and the matter remanded for a new trial in accordance herewith.